IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:07-CR-35 |
| | ) | (VARLAN/SHIRLEY) |
| V. | ) | |
| | ) | |
| JEFFREY DEAN JONES, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the district court as

may be appropriate. Defendant Jeffrey D. Jones ("Defendant") is charged in a seven count

Superseding Indictment for the alleged possession and use of explosive devices, as well as related

firearms charges. [Doc. 52] This matter is before the Court on the defendant's Motion to Suppress

Statements [Doc. 20] and Motion to Suppress Evidence. [Doc. 21] On June 3, 2008, the parties

appeared before the Court for an evidentiary hearing on the instant motions. On June 20, 2008, the

government moved the Court to reopen the evidentiary hearing so that it could present evidence it

obtained after the close of the hearing. [Doc. 43] On July 17, 2008, the Court granted the

government's motion. [Doc. 48] On September 4, 2008, the parties again appeared before the Court

for an evidentiary hearing on the instant motions. At both the June and September hearings,

Assistant United States Attorney J. Edgar Schmutzer appeared on behalf of the government, and

Assistant Federal Defender Jonathan A. Moffatt appeared on behalf of the defendant, who was also

present. After the September 4 hearing, the Court took the matter under advisement and it is now

ripe for adjudication.

Defendant Jones ("Defendant") moves the Court to suppress all statements made by Defendant as to the events at issue in this case, including any statements made on March 7, 2007. As grounds, Defendant contends that any statements made by Defendant were not made voluntarily, knowingly, and intelligently. Defendant further argues that, at the time the statements were made, he had not yet recovered from his recent treatment at Moccasin Bend Mental Health Institute ("Moccasin Bend") and further argues that law enforcement agents threatened to charge Defendant's family if Defendant did not assist the police, thus forcing Defendant to make the statements at issue.

Defendant also moves the Court to suppress all evidence obtained from the March 7, 2007, warrantless search of Defendant's residence. As grounds, defendant contends that law enforcement did not obtain a warrant prior to searching the residence. Defendant further argues that any consent to such a search was invalidated by coercive tactics employed by law enforcement.

The government opposes the two motions, arguing that the statements were made voluntarily, knowingly, and intelligently, that Defendant was not under the influence of any medications at the time of the statements, and that Defendant was not coerced into making the statements in question. The government further argues that law enforcement obtained consent, which was freely given, to search the residence, and thus the search was valid.

## I. SUMMARY OF TESTIMONY: JUNE 3, 2008, HEARING

### A. Testimony of Bernard Waggoner

The government called as its first witness Special Agent Bernard Waggoner ("Agent Waggoner"), a criminal investigator with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") stationed in Knoxville, Tennessee. Agent Waggoner testified that he had been with the ATF since 1989 and that he had been involved in the investigation of this case. Agent Waggoner

2

stated that the Knoxville ATF office was contacted on March 5, 2007, by the Sweetwater Police Department ("SPD"). Agent Waggoner testified that SPD officers had observed what were believed to be unexploded pipe bombs in the SPD vehicle impound lot, so they contacted the ATF office to request assistance with the investigation. Agent Waggoner stated that he and other ATF agents responded to the call that same day. Agent Waggoner further stated that the Tennessee Bomb and Arson Unit ("BAS"),[1] the SPD, and the Sweetwater Fire Department also participated in the investigation.

Agent Waggoner testified that upon arriving at the SPD impound lot, he observed what appeared to be unexploded improvised explosive devices: pipe bombs. Agent Waggoner testified that he also observed what he believed to be blast damage from exploded pipe bombs. Agent Waggoner stated that, upon arriving, he began to investigate and process the scene and that, during the investigation, Defendant was identified as a suspect. Agent Waggoner testified that a gold Dodge Dakota truck, which had been seized and placed in the SPD impound lot, appeared to have been the target of the bombs, because some of the unexploded bombs were found underneath the truck.[2]

Agent Waggoner testified that the next evening, March 6, 2007, Agent Daniel Foster ("Agent Foster") of the BAS went to Defendant's residence (the "Residence"). Agent Waggoner stated that on March 7, 2007, Agents Waggoner, Foster, and other police investigators returned to the

---

[1]The Court takes judicial notice of the fact that the formal name for the bomb unit is the Bomb and Arson Section of the Tennessee Department of Commerce and Insurance, Division of Fire Prevention.

[2]Agent Waggoner did not, at that time, testify as to the owner of the truck, but later testimony links the truck to Defendant.

Residence. Agent Waggoner testified that, at that time, Jennifer Jones ("Mrs. Jones"), Defendant's wife, gave the officers written consent to search the Residence. Agent Waggoner stated that the officers searched the Residence for any evidence of explosives and discovered a number of improvised explosive devices in the Residence.

Agent Waggoner was then shown what was later introduced into evidence as Exhibit 1. Agent Waggoner identified Exhibit 1 as one of the consent form signed by Mrs. Jones. The consent form states that it authorizes Agent Foster to search the Residence for "fire arms, ammunitions, components to make devices" and further authorizes the agent to seize any evidence of a crime. [Exhibit 1] The consent form also states that "[t]his written permission is given by me to the above named Special Agent(s) voluntarily and without threats or promises of any kind, and shall be effective until such time their investigation is complete." [Id.] The form is dated March 7, 2007, signed by Mrs. Jones, and witnessed by Mary Clayton and Mike Bice. [Id.] Agent Waggoner stated that he observed Mrs. Jones sign Exhibit 1, and that Agent Foster read the waiver to Mrs. Jones.

Backing up to the time when the agents arrived at the Residence on March 7, 2007, Agent Waggoner testified that he, Agent Foster, and Mike Bice ("Detective Bice") of the Rhea County Sheriff's Department ("RCSD") went to the front door of the residence, where they met Mrs. Jones. Agent Waggoner stated that the officers then explained the consent forms to Mrs. Jones. Agent Waggoner testified that while talking to Mrs. Jones, Mary Clayton ("Ms. Clayton"), Defendant's mother, who lived nearby, arrived at the Residence. Agent Waggoner stated that he explained to Mrs. Jones that she did not have to sign the form, that it was a voluntary consent form, and that she could speak to a lawyer if she wanted. Agent Waggoner testified that the officers told Mrs. Jones that they were investigating pipe bombs found at the SPD impound lot and that her husband was a

4

suspect. Agent Waggoner stated that Mrs. Jones told them that her husband would not make bombs in the house, to which the officers responded that she should let them search, that if they did not find anything, then they did not find anything. Agent Waggoner testified that Mrs. Jones then signed the consent form and the officers searched the Residence.

Agent Waggoner testified that when Agent Foster came to the Residence the previous night, Mrs. Jones had signed two other consent forms which allowed the agent to search out buildings and a 2004 Pontiac Bonneville located at the Residence, and a 1998 Chevy Blazer located on Pitman Lane in Spring City. The consent forms were later entered into evidence as Exhibits 2 and 3.

Returning to the night of March 7, 2007, Agent Waggoner testified that when Mrs. Jones first answered the door at the Residence, the three officers were able to observe a gun cabinet with a glass door inside the living room. Agent Waggoner stated that from the front door, he observed several firearms inside the gun cabinet. Agent Waggoner testified that, by that point in the investigation, Agent Waggoner knew that Defendant had prior felony convictions and that this was Defendant's residence, so the agent knew that he could obtain a federal search warrant based on what the agent believed to be a violation of the Gun Control Act.

Agent Waggoner testified that while speaking with Mrs. Jones and Ms. Clayton on the night of the 7th, one of the two ladies advised the officers that there were guns in the house and confirmed that Defendant was a convicted felon. Agent Waggoner stated that after Mrs. Jones signed the consent, the officers did a quick security sweep of the Residence and then began searching the Residence. Agent Waggoner testified that other ATF agents and officers from the RCSD assisted in the search and that, for most of the search, Mrs. Jones and Ms. Clayton remained upstairs with one of the officers.

Agent Waggoner testified that the Residence had a large basement and that in the basement, the officers observed a large metal lathe and other metal working tools. Agent Waggoner stated that he understood the Defendant to be a licensed machinist or pipefitter, so Defendant knew how to work with metal. The agent also testified that the lathe observed in the basement could be used in the construction of pipe bombs and that there were metal shavings around the lathe, so the agent believed that it had been used recently to work metal.

Agent Waggoner testified that in the basement, the officers also found what the agent described as either a box or a Tupperware container. Agent Waggoner further testified that inside the box/container they found a paper bag containing items the agent suspected to be pipe bombs. Agent Waggoner stated that he believed that two of the suspected pipe bombs were made of metal and that one was made of plastic, but that he would need to look at the evidence log to confirm that. Agent Waggoner testified that in another bag, the officers found what the agent described as more bomb components, specifically end caps and pipe. Agent Waggoner testified that the suspected bombs found in the Residence were almost identical to the bombs found at the SPD impound lot.

Agent Waggoner testified that after the officers discovered the suspected bombs, Mrs. Jones was brought downstairs and the officers asked her about them. Agent Waggoner stated that Mrs. Jones told the officers that they looked like pipe bombs and that she guessed she was wrong. Agent Waggoner testified that Mrs. Jones was then taken back upstairs and the Residence was evacuated until the Chattanooga Bomb Squad could arrive and secure the suspected bombs.

Agent Waggoner testified that it would take approximately one and a half to two hours for the bomb squad to arrive, so, while waiting, he drove over to the Rhea County Jail where Defendant was being held on a state probation violation. Agent Waggoner stated that, upon arriving at the jail,

he and Detective Rocky Potter ("Detective Potter") of the RCSD interviewed Defendant. Agent Waggoner testified that near the end of the interview, ATF Special Agent Steve Parris ("Agent Parris") joined the officers. Agent Waggoner stated that, at the time of the interview, Defendant had not been charged with any of the crimes in the instant case.

Agent Waggoner testified that Defendant was brought from the holding area and placed in an interview room, where the agent and Detective Potter joined the Defendant. Agent Waggoner further testified that he then introduced himself, identified himself as an ATF agent, and told Defendant that he was investigating pipe bombs found at the SPD impound lot. Agent Waggoner stated that he advised Defendant that he was a suspect and that the officers wanted to interview him. Agent Waggoner testified that he told Defendant that Mrs. Jones had consented to a search of the Residence and that the officers had found pipe bombs in the basement, as well as guns, ammunition, and tools capable of constructing pipe bombs. Agent Waggoner stated that he explained to Defendant that a common tactic for the construction of improvised explosive devices is to remove the gunpowder from ammunition so that the gunpowder can be used in pipe bombs. Agent Waggoner testified that Defendant then agreed to speak to the officers, so Agent Waggoner read Defendant his rights.

Agent Waggoner was then shown what was later introduced into evidence as Exhibit 4. The agent identified Exhibit 4 as a two sided document with a statement form on one side and waiver of rights signed by Defendant and witnessed by the agent and Detective Potter on the opposite side. Agent Waggoner stated that the hand writing in the statement portion of the form is Defendant's. The waiver advises the reader of his Miranda rights, and the bottom of the waiver indicates that:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions.

7

I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made against me and no pressure or coercion of any kind has been used. I declare that I am not under the influence of alcohol or drugs.

[Exhibit 4]

Agent Waggoner testified that he read the waiver to Defendant and asked him if he understood his rights, to which Defendant responded that he did. Agent Waggoner stated that he asked Defendant to sign the waiver, which Defendant did, and that he then spoke with Defendant about the bombs found at the impound lot and at the Residence. Agent Waggoner testified that Defendant denied any knowledge of either. Agent Waggoner stated that Defendant seemed lucid during the interview. Agent Waggoner indicated that, a few minutes into the interview, Detective Potter asked the agent to let Detective Potter and Defendant speak to each other alone.

Agent Waggoner testified that he left the interview room , went into the office next door, and watched the interview through a two-way mirror. Agent Waggoner stated that he called his supervisor at the ATF from the office. Agent Waggoner indicated that he could not hear the conversation in the interview room, but could see what was going on. The agent stated that after a few minutes, no more than five minutes maximum, Detective Potter exited the interview room and told the agent that Defendant had admitted to being responsible and would talk to the agent now.

Agent Waggoner testified that he then returned to the interview room and resumed speaking with Defendant. The agent stated that Defendant admitted creating the explosives and told the agent that he created the bombs in a shed behind the Residence. Agent Waggoner testified that Defendant said that he was angry at the SPD for seizing his truck during a prior drug investigation. Agent Waggoner further testified that Defendant said that he created at least three pipe bombs, possibly more, and that Defendant said he could not remember the exact number.

8

At this point in the hearing, a report Agent Waggoner had been referring to was entered into evidence as Exhibit 5. The agent identified Exhibit 5 as an ATF Report of Investigation dated March 12, 2007, prepared by the agent. The report describes the March 7, 2007, interview of Defendant by Agent Waggoner and Detective Potter. [Exhibit 5]

Returning to his description of the interview, Agent Waggoner then testified that Defendant stated that he could not remember the exact date that he had created the bombs. Agent Waggoner indicated that Defendant told the officers that he had purchased a can of gun powder from a Wal-Mart in either Dayton or Chattanooga for use as an explosive for the bombs, and obtained fuses for the bombs by pulling the fuses out of what Defendant described as M-80 firecrackers. Agent Waggoner stated that Defendant told the agent that he used the tools in his basement to construct the bodies of the devices, and then drilled the fuse hole and assembled the devices in a shed behind the Residence. Agent Waggoner indicated that Defendant said that he assembled the bombs in the shed because he was afraid they might explode during assembly.

Agent Waggoner testified that Defendant told the agent that he was a trained machinist and that he had learned how to construct the bombs from watching television. Agent Waggoner stated that Defendant admitted that he had constructed the devices found in the basement of the Residence and that Defendant said that he knew his truck was being held in the SPD impound lot because an SPD officer had taken Defendant to the truck to remove some personal property from the truck. Agent Waggoner indicated that Defendant told the agent that one evening the previous week, driving his Chevrolet SUV, he took the bombs to the impound lot, lit the fuses, and threw the bombs into the lot. Agent Waggoner testified that Defendant stated that he did not see where the bombs landed, that he drove away before the bombs exploded, and that he had done this in an effort to get revenge

9

on the SPD for seizing his vehicle.

Agent Waggoner testified that he then asked Defendant to make a written statement, so Defendant made the hand written statement found on Exhibit 4. Agent Waggoner indicated that the statement reads: "I, Jeff Jones, reside at 195 Doc Smith Road. I got mad at Sweetwater Police Department for getting my truck. I decided to make the pipe bombs and throw them in the lot." Agent Waggoner stated that after Defendant finished the statement, the agent told Defendant to draw a line across the rest of the form and sign his name, so Defendant drew a horizontal line under his statement and signed his name. Agent Waggoner testified that Defendant then told the agent that he wanted to make sure the officers understood that Mrs. Jones had nothing to do with the acts described by Defendant, so Defendant wrote in above his statement "Without my wife [sic] knowledge."

Agent Waggoner testified that a yellow plastic milk jug with a wick, a Molotov cocktail, was also found in the SPD impound lot. The agent stated that the wick appeared to have gone out, so the device did not explode, but instead the gasoline ran out on the ground. Agent Waggoner indicated that Defendant denied any knowledge of the Molotov cocktail, but did admit to making the pipe bombs.

Agent Waggoner testified that during the interview, Defendant was lucid, coherent, made sense when he spoke, and seemed to know what he was doing. The agent stated that he was not in possession of Defendant's medication, did not know about Defendant's medication, and did not tell Defendant that Defendant would not receive his medication if he did not cooperate. The agent stated that he knew that Defendant had been at Moccasin Bend and had been discharged that morning, after which he was immediately taken into custody on the state probation violation. Agent Waggoner

10

testified that he did not know whether Defendant was on drugs or not, only that Defendant had told them that he was not under the influence of any drugs or medicine.

Agent Waggoner testified that Defendant did not tell the officers that he wanted to speak with a lawyer. Agent Waggoner further testified that the officers did not tell Defendant that Mrs. Jones had been handcuffed and was crying, nor did the officers tell Defendant that his family would be charged if he did not cooperate. Agent Waggoner stated that, to his knowledge, Mrs. Jones was never handcuffed.

Agent Waggoner testified that after the interview, the agent returned to the Residence. Agent Waggoner indicated that by that time, Tim Jones, Defendant's brother, had arrived at the scene, and that Ms. Clayton and Mrs. Jones were still at the Residence. Agent Waggoner stated that Mrs. Jones was not allowed to interfere with the areas where the officers were searching, and was required to evacuate the Residence after the bombs were found, but was otherwise given free reign. Agent Waggoner testified that Mrs. Jones spent some of the time in the kitchen and also spent some time in Tim Jones' truck.

Agent Waggoner testified that Defendant's family members told the officers that two of the guns in the gun case were family heirlooms that had belonged to Defendant's deceased father, but that the other guns belonged to Defendant. Agent Waggoner stated that the officers allowed Tim Jones to take possession of the heirlooms after signing for them. Agent Waggoner further stated that, to his knowledge, no threats were made to the family. Agent Waggoner indicated that things were cordial with Tim Jones, but that Ms. Clayton did get upset at times and would start crying, but then would calm down.

Agent Waggoner testified that while searching the basement of the Residence, the agent

found a large number of pill bottles in a toolbox. Agent Waggoner stated that the pill bottles contained prescription medications, but the prescriptions were in the name of Ms. Clayton. The agent was then shown a document titled Rhea County Sheriff's Department Authorization for Consent to Search, which was later entered into evidence as Exhibit 6. Agent Waggoner testified that he and Detective Bice discussed whether the detective could seize the drugs under the consent they had already received, and they decided to obtain the consent form marked as Exhibit 6 to cover the drugs. Agent Waggoner stated that he could not recall if he actually witnessed Mrs. Jones sign Exhibit 6.

Agent Waggoner testified that it was dark by the time the officers finished searching and left the Residence. Agent Waggoner stated that one of the items they seized was a computer, because they wanted to investigate the computer's hard drive. Agent Waggoner testified that Defendant later signed a consent form, Exhibit 7, authorizing a search of the computer, but nothing relevant to this case was found on the computer's hard drive.

On cross-examination, Agent Waggoner testified that the RCSD consent form identified as Exhibit 6 was executed at 7:00 p.m., approximately four to four and a half hours after the consent form identified as Exhibit 1 was executed and after evidence had already been seized by law enforcement. Agent Waggoner stated that he first became involved in the case on March 5, 2007, and stated that it was on March 5th that he went to the SPD impound lot in relation to this case. Agent Waggoner testified that Defendant was an early suspect in this case. The agent stated that other vehicles were damaged by the explosives and that, while the SPD may have had records as to the owners of the other damaged vehicles, the agent did not know who the other damaged vehicles belonged to.

Agent Waggoner testified that they were considering several other leads, including whether juveniles had committed the act as vandalism. Agent Waggoner stated that he believed that a Ford Explorer in the impound lot was damaged by the blasts. The agent testified that he believed that the Explorer had been seized from a drug dealer, and that fact had been considered during the investigation. Agent Waggoner further testified that witnesses were interviewed about the impound lot bombing, but that he did not believe that any other suspects were questioned. Agent Waggoner indicated that the three primary leads were Defendant, possible juvenile vandalism, and the drug dealer associated with the Ford Explorer, but stated that Defendant rose to the forefront because of the explosives found underneath his truck.

Agent Waggoner testified that prior to March 7, 2007, he knew that Defendant was being treated at Moccasin Bend. The agent stated that he believed that he obtained information as to Defendant's hospitalization based on Agent Foster's March 6, 2007, conversation with Mrs. Jones. The agent indicated that he understood Moccasin Bend to be a state run psychiatric institution. Agent Waggoner testified that he was told that Defendant had been hospitalized because of a drug overdose, but stated that Defendant's family directly told the agent it was a suicide attempt. Agent Waggoner stated that Agent Foster told him that Defendant had been hospitalized for a drug overdose, but could not recall if Agent Foster also told him that Mrs. Jones had indicated that it was a suicide attempt.

Agent Waggoner testified that someone else working on the case had run Defendant's criminal history, and that he did know Defendant was a convicted felon. Agent Waggoner stated that he knew that Defendant had been convicted on drug charges, but that he was not sure whether the charges involved a forged prescription.

13

Agent Waggoner indicated that he did know that Defendant had been in Moccasin Bend immediately before the agent interviewed him. Agent Waggoner testified that he also knew that Defendant's probation violation was out of McMinn County, and that normally he would have been taken to the McMinn County Sheriff's Department. Agent Waggoner stated that he knew Defendant was going to be picked up from Moccasin Bend and said that he believed he asked that Defendant be brought to Rhea County. Agent Waggoner testified that it was reasonable to assume that Defendant might have received medication at Moccasin Bend, but that he made no attempt to discover whether that was the case.

Agent Waggoner testified that when he met with Defendant for the March 7th interview, it was just Detective Potter and himself, and that the officers spoke with Defendant for some time before Defendant signed the waiver. Agent Waggoner indicated that he told Defendant about the search of Defendant's basement, and that he described the locked freezer in Defendant's basement in an attempt to show Defendant that they had been investigating the case. Agent Waggoner testified that the three pipe bombs found in the bag in the basement did not have wicks, but were just pipes with end caps.

Agent Waggoner stated that he had not accompanied Agent Foster to the Residence on March 6, 2007, but that Agent Waggoner was one of the initial officers that went into the Residence on March 7th. Agent Waggoner indicated that he did not recall anyone telling Mrs. Jones that they were investigating because someone might be after her husband. Agent Waggoner testified that he told Mrs. Jones that they wanted to search the Residence for evidence of the manufacture of explosives.

Agent Waggoner testified that he could not recall whether he made or received any phone

14

calls in front of Defendant during the interview, but denied telling Defendant that Mrs. Jones was in danger of being prosecuted. Agent Waggoner indicated that, after the interview with Defendant, the Rhea County Sheriff came to the Residence, but the agent denied telling the Sheriff that they had obtained Defendant's confession by telling Defendant that his wife was being held in the back of a police car.

Agent Waggoner testified that he had called the lathe found in the basement a metal lathe because of the metal shavings found near it. Agent Waggoner indicated that he did not know the difference between a wood lathe and metal lathe.

Agent Waggoner indicated that he did not have any separate notes of his interview with Defendant, but rather that he had made the report in evidence relatively soon after the interview. Agent Waggoner stated that he did possess an independent recollection of the interview, but that the report also detailed what occurred during the interview.

Agent Waggoner testified that the officers continued to talk to Defendant during the interview, that it was not just a one sided conversation. Agent Waggoner stated that they did discuss places where gun powder can be purchased, such as Wal-Mart, but that he did not recall anyone telling Defendant that for a firecracker fuse to be useful, it would have to be from an M-80. Agent Waggoner agreed that he suspected Defendant was angry with the SPD prior to the interview, and that he believed that he knew Defendant was a machinist prior to the day of the interview. Agent Waggoner indicated that at the time of the interview, the officers believed that the bombs were being constructed in Defendant's basement.

Agent Waggoner stated that the interview was not recorded and that he normally did not record interviews if there were other officers to act as a witness. Agent Waggoner indicated that he

did not know if that was the written policy of the ATF or of the local ATF office, but that was how he did it. Agent Waggoner testified that he did not believe that he asked if the officers at the Rhea County Jail had a tape recorder or video camera. Agent Waggoner agreed that recording an interview would allow others to determine what transpired during the interview.

On redirect examination, Agent Waggoner testified that he was not aware of the FBI's policy on recording interviews, but indicated that he normally did not if he had someone to serve as a witness. The witness was then excused.

## B. Testimony of Daniel Foster

The government next called Agent Foster. Agent Foster testified that he is a special agent of the Tennessee Bomb and Arson Section. Agent Foster indicated that he was involved in the investigation of this case on March 6, 2007. Agent Foster testified that on the evening of March 6th, the agent contacted the RCSD to let them know that he was following an investigation started in Sweetwater and asked for their assistance.

Agent Foster indicated that on the evening of the 6th, he and a deputy from the RCSD went to the Residence and spoke with Mrs. Jones. Agent Foster testified that he introduced himself and the deputy to Mrs. Jones and that he asked Mrs. Jones for her consent to search the Residence, outbuildings, and vehicles. Agent Foster stated that Mrs. Jones asked why they wanted to search, so he told her that he was working on an ongoing investigation out of Sweetwater. Agent Foster testified that he explained to Mrs. Jones that they had found some items in that investigation that caused them to want to find out if the items were connected to Defendant and the Residence, and whether Mrs. Jones was safe or unsafe. Agent Foster stated that he told Mrs. Jones that even if it was not connected to Defendant, he still wanted to find out because Mrs. Jones still might be in safe

or unsafe conditions if someone was trying to harm her husband. Agent Foster testified that Mrs. Jones then signed the consent forms previously marked as Exhibits 2 and 3.

Agent Foster testified that after obtaining consent, he searched the Bonneville and outbuildings described in Exhibit 2. Agent Foster indicated that he found no relevant evidence in the Bonneville, but did find some wire in an outbuilding similar to wire found on the devices in Sweetwater, so he took a sample of the wire. Agent Foster stated that he obtained the consent to search the Chevy Blazer [Exhibit 3] because there had been a report of a similar vehicle linked to the Sweetwater incident, but no evidence was found. Agent Foster stated that he did not receive consent to search the Residence that evening.

Agent Foster testified that the next day, March 7th, Agent Foster returned to the Residence with Agent Waggoner, at which point Mrs. Jones provided consent to search the Residence. [Exhibit 1] Agent Foster stated that Agent Waggoner explained to Mrs. Jones that she did not have to consent to the search if she did not want to. Agent Foster further testified that Agent Waggoner told Mrs. Jones that her husband was a person of interest in the case and that there could be bomb components in the Residence, so they needed to look for those to determine whether the Residence was safe.

On cross-examination, Agent Foster testified that he first became involved in the investigation on March 5, 2007, when pipe bombs were discovered in the SPD impound lot. Agent Foster stated that he did not believe they had any suspects on March 5, 2007, but that on March 6, 2007, the officers realized that a vehicle with bombs under it belonged to Defendant. Agent Foster indicated that there were other vehicles with bombs near them, and another vehicle that was damaged, but stated that he was not aware of any leads being investigated as to those other vehicles.

Agent Foster testified that Defendant was a person of interest on March 6th, and that the investigation had to start somewhere.

Agent Foster testified that the Chevy Blazer described in Exhibit 3 was not located at the residence, but he could not recall how he discovered where the vehicle was located. Agent Foster stated that he could not recall if he spoke with Mrs. Jones or Ms. Clayton on the phone that day, but indicated that he may have spoken with Ms. Clayton. Agent Foster testified that Ms. Clayton could have been the person to tell him where the Blazer was located, but he was not sure.

Agent Foster testified that when he went to the Residence on March 6th, Defendant's brother was present, but that he could not remember the brother's name. Agent Foster stated that Defendant's brother was standing on the porch when the agent spoke with Mrs. Jones, and that the brother would probably have been able to hear their conversation. Agent Foster indicated that he advised Mrs. Jones that her husband was a person of interest in their investigation, and that they did not know if Defendant was involved, or if someone was trying to injure Defendant, but either way they needed to search to make sure she was safe. Agent Foster stated that anything was possible at that point in the investigation, so it was possible that there might be dangerous items around or under the vehicles at the residence. Agent Foster testified that he remembered searching around a tractor on the premises, but does not recall Tim Jones telling him that he might want to look at the tractor. Agent Foster indicated that Tim Jones was in the area throughout the search, and that he did not recall having any further conversation with Mrs. Jones after the search.

Agent Foster testified that on the next day, March 7th, he, Detective Bice, and Agent Waggoner were the first officers to arrive at the Residence. Agent Foster stated that Agent Waggoner advised Mrs. Jones that they did not know whether someone might be after Defendant.

18

Agent Foster agreed that a person might be more willing to provide consent to search her house if she thought that someone was trying to harm a loved one than she would if she thought the police were investigating that loved one. Agent Foster also agreed that it was more likely a person would let them search if the person thought that she was in danger or if she thought someone might be trying to kill a loved one.

On redirect, Agent Foster testified that he did not remember the exact words, but that the officers did tell Mrs. Jones that her husband was being investigated, and that it was clear to Mrs. Jones that her husband was being investigated. Agent Foster then testified that on March 7th, the officers did not tell Mrs. Jones that they were concerned about her husband's safety and that he might be a target. Agent Foster indicated that his prior testimony was mistaken and that he was confusing what was said on the 6th and on the 7th.

On recross, Agent Foster testified that he did not recall the officers mentioning that they were concerned about the safety of Defendant. Agent Foster testified that by the 7th, the officers knew more positively that Defendant was their suspect. Agent Foster indicated that on March 6th, he did not define for Mrs. Jones what he meant by the phrase "person of interest." The witness was then excused.

## C.     Testimony of Mike Bice

The government next called Detective Bice. Detective Bice testified that he is a narcotics detective for the RCSD. Detective Bice indicated that on March 7th, he accompanied Agents Waggoner and Foster to the Residence. Detective Bice stated that upon arriving at the Residence, Agent Waggoner advised Mrs. Jones that her husband was a suspect in a pipe bombing incident and asked her for consent to search the Residence. Detective Bice testified that it was made clear to Mrs.

19

Jones that her husband was a suspect. Detective Bice indicated that Mrs. Jones was also advised of her rights as to the search, that she did not have to consent to the search. Detective Bice testified that Mrs. Jones did consent to the search and that Ms. Clayton witnessed the consent.

Detective Bice testified that after obtaining consent, the officers searched the Residence. Detective Bice indicated that in the basement, they found some pipes and a lathe with metal shavings around it. Detective Bice stated that they also found some pills in a toolbox. Detective Bice indicated that after finding the pills, they asked Mrs. Jones to execute an additional consent form to cover the pills. [Exhibit 6] Detective Bice testified that he observed Mrs. Jones sign Exhibit 6.

Detective Bice testified that when Mrs. Jones first opened the front door of the Residence to speak to the officers, he saw a gun cabinet filled with guns in the Residence. Detective Bice further testified that Mrs. Jones was not handcuffed and was, for the most part, allowed to walk around the premises.

On cross-examination, Detective Bice testified that was not involved in the March 6th trip to the Residence. Detective Bice stated that on March 7th, another detective directed Detective Bice to meet up with Agents Waggoner and Foster. Detective Bice testified that Ms. Clayton was not present when the officers began speaking with Mrs. Jones on March 7th, but that Ms. Clayton arrived shortly after the conversation began. Detective Bice indicated that he did not recall Mrs. Jones being advised that the officers thought her husband might be in danger.

Detective Bice testified that he had joined the agents to help with their investigation of the bombing at the SPD impound lot, not for a firearms investigation. Detective Bice reiterated that the officers found pipes and a lathe in the basement, and that there were metal shavings near the lathe, but indicated that he could not differentiate between a wood lathe and a metal lathe. The witness

was then excused.

**D.** **Testimony of Kenneth Rocky Potter**

The government next called Detective Potter. Detective Potter testified that he was a detective with the RCSD. Detective Potter testified that on March 7, 2007, he was involved in an interview with an ATF agent at the RCSD involving pipe bombs. Detective Potter testified that he was asked to assist Agent Waggoner with an interview of Defendant. Detective Potter stated that Agent Waggoner introduced the officers to Defendant and read Defendant his rights. Detective Potter testified that a few minutes after the interview started, the detective felt like the interview was not going anywhere, so he asked the Agent to step out of the room so that the detective and Defendant could speak.

Detective Potter testified that after Agent Waggoner left the room, the detective told Defendant that he was a local, a detective in Rhea county, and that he felt that Defendant might be more comfortable talking to a local rather than to the "alphabet cops." Detective Potter indicated that Defendant said that he would be more comfortable talking to him. Detective Potter testified that Defendant then told Detective Potter "what he had done," that they discussed it for a few minutes, and then the detective left the room to speak to Agent Waggoner. Detective Potter testified that there is a two-way mirror between the interview room and the nearby office of the narcotics officer.

Detective Potter testified that Defendant was never told that his family members would be charged if he did not cooperate. Detective Potter indicated that he did not know if Defendant was married, or who was involved in the investigation. Detective Potter stated that Defendant never asked for a lawyer. Detective Potter testified that Defendant was never told that Mrs. Jones was being held in handcuffs and was crying.

21

Detective Potter was then shown the document previously marked as Exhibit 4. Detective Potter identified Exhibit 4 as the standard RCSD statement form and waiver. Detective Potter testified that Agent Waggoner read Defendant his rights, that Defendant said he understood those rights, and that Defendant signed the waiver in the detective's presence. Detective Potter testified that the Defendant seemed lucid and coherent throughout the interview. Detective Potter testified that Defendant also wrote the statement on the statement portion of the form and that he did that in the Detective's presence. Detective Potter testified that Defendant indicated that he wanted the officers to know that his wife had nothing to do with the bombs, so he added a statement to that effect at the top of the form. Detective Potter testified that prior to filling out the statement form, Defendant confessed to making and throwing bombs.

On cross-examination, Detective Potter testified that the first time he heard about the case was on March 7th, and that he was not involved in the search of the Residence. Detective Potter testified that he was not aware that Defendant had been at Moccasin Bend earlier that day and did not know if any steps were taken to have Defendant brought to the RCSD. Detective Potter testified that he did not know why Defendant was there, only that he had been asked to assist Agent Waggoner with the interview. Detective Potter testified that he was never informed that Defendant had been at the hospital.

Detective Potter testified that, other than Defendant telling the officers that he takes prescription medications, the officers and Defendant did not discuss Defendant's medications. Detective Potter indicated that he did not know if the jail had been provided with any medications for Defendant, that it would be the jail administrators who would know that. Detective Potter stated that he had not discussed Defendant's medication with the administrators.

Detective Potter stated that early in the interview, Defendant denied any involvement in the crimes. Detective Potter agreed that Agent Waggoner took the lead in the interview, and that the agent did most of the talking. Detective Potter testified that Agent Waggoner did tell Defendant that the agent had been to Defendant's Residence and had been in the basement. Detective Potter testified that Agent Waggoner did not go into any specifics as to the Residence. Detective Potter agreed that Agent Waggoner did tell Defendant that they believed Defendant had been making bombs. Detective Potter testified that he did not recall any mention of Defendant's wife.

Detective Potter agreed that Agent Waggoner was not getting anywhere with Defendant, so that was why the detective asked to speak to Defendant alone. Detective Potter agreed that they wanted to get a confession from Defendant. Detective Potter testified that they do not record their interviews at the RCSD, that the district attorney had directed them not to. Detective Potter stated that there is a video camera in the interview room, but he indicated that GED testing of inmates is often performed in the interview room, so the police use the camera to ensure that no contraband is passed to an inmate during the test. Detective Potter indicated that the video feed from the camera is not recorded.

Detective Potter testified that he did not recall telling Defendant to "be a man," only that he wanted to discuss the matter with Defendant and that Defendant might feel more comfortable with a local. Detective Potter testified that he did not recall telling Defendant that Defendant could trust him. Detective Potter indicated that Defendant signed the rights waiver before the detective had his private conversation with Defendant and before Defendant denied any involvement in the crimes at issue.

Detective Potter testified that when Agent Waggoner returned to the room, that the three men

discussed what Defendant had done and began working on Defendant's statement. Detective Potter indicated that Defendant's written statement [Exhibit 4] was very basic, and that Defendant had discussed details which were not in the statement, such as where he had gotten the fuses. Detective Potter stated that Agent Parris did join the three men at some point, but that it was very late in the interview, when the interview was almost done. Detective Potter testified that Defendant told the officers he had purchased gun powder from Wal-Mart and used fuses from firecrackers. Detective Potter stated that one of the officers did bring up the subject of Wal-Mart, but that Defendant had also said it. Detective Potter said that he recalled Defendant saying that he had thrown items into the impound lot, but he could not recall Defendant mentioning a Molotov cocktail.

Detective Potter testified that he was not aware of a prior suicide attempt by Defendant, nor did he know of Defendant's prior criminal history. Detective Potter testified that he did not know Defendant had recently been at the Rhea County Medical Center, nor at Moccasin Bend. Detective Potter indicated that he had no knowledge as to Defendant's mental health. Detective Potter testified that Defendant did tell the officers about his wife, that she lived with him and had nothing to do with the crime. The witness was then excused.

**E.      Testimony of Dr. Brent R. Coyle**

The Defendant then called Brent R. Coyle, M.D. ("Dr. Coyle). Dr. Coyle testified that he is an acute care psychiatrist employed by Blount Memorial Hospital, where he is the Medical Director of the Emotional Health and Recovery Center. Dr. Coyle testified that he has held the position of medical director for the past six years. Dr. Coyle stated that he obtained his medical degree from the University of Minnesota, Minneapolis. Dr Coyle testified that he then spent seven years at Lackland Air Force Base in San Antonio, Texas, with four years of residency training and

then three years on faculty.  Dr. Coyle indicated that he next moved to Johnson City, where he spent approximately nine years as the residency training director for the psychiatry program at East Tennessee State University, where he still maintains a clinical faculty position.

Dr. Coyle testified that his clinical involvement at Blount Memorial Hospital is mostly acute care psychiatry, working with patients who are acutely suicidal, psychotic, or with acute detox needs.  Dr. Coyle stated that he also carries patients into the partial hospitalization program, and, following that, intensive out patient program.  Dr. Coyle testified that he performs approximately 200 examinations a month.  Dr, Coyle testified that he has also worked as a contract psychiatric consultant with the Department of Energy since 2002, and recently received a "more permanent" contract with the Department of Energy.  Dr. Coyle's curriculum vitae was then entered into evidence as Exhibit 8 and Dr. Coyle was tendered as an expert for the purposes of the evidentiary hearing.

Dr. Coyle testified that he had seen Defendant on three separate occasions for a total duration of approximately four hours and fifteen minutes.  Dr. Coyle stated that he was asked by defense counsel to examine Defendant to determine whether Defendant had any clinical needs.  Dr. Coyle testified that when he first saw Defendant, Defendant was suffering from severe depression, as well as the aftermath of substance abuse and psychotic symptoms.  Dr. Coyle opined that it is important for someone suffering from psychotic depression to receive both antidepressants and antipsychotics, but indicated that Defendant had not received such treatment.  Dr. Coyle testified that he believed the jail followed through on his recommended treatment of Defendant and that Dr. Tenneson prescribed the antidepressant of Duloxetine (also known as Cymbalata) and the antipsychotic of Risperdal (also known as Risperidone).

Dr. Coyle testified that he diagnosed Defendant with major depression with psychotic features, as well as untreated opiate dependence. Dr. Coyle indicated that Defendant had not received any opiates during the course of his incarceration, but that he was far from being treated for his substance disorder. Dr. Coyle identified the following factors as being indicative of Defendant's major depressive disorder: sleep changes, appetite changes, lack of interest, energy, abject hopelessness, helplessness, worthlessness, and a prevalent and long term sense of guilt and shame. Dr. Coyle testified that the psychotic aspect of the diagnosis stemmed from Defendant's auditory and visual hallucinations, which included seeing things coming out of the walls and hearing voices. Dr. Coyle testified that he has observed Defendant respond to a visual hallucination, that he observed Defendant attempting to, as Defendant described it, "stare down" a hallucination as a coping mechanism. Dr. Coyle testified that he met with Defendant on January 10, 2008, February 14, 2008, and May 26, 2008.

Dr. Coyle testified that he had been provided with, and reviewed, Defendant's medical records from the medical center where he was admitted for his suicide attempt and his subsequent records from Moccasin Bend. Dr. Coyle indicated that in the first week of March 2007, approximately March 5, 2007, Defendant had an encounter with law enforcement related to the instant case. Dr. Coyle testified that his diagnosis of Defendant (major depression with psychotic symptoms) would have covered both time periods. Dr. Coyle stated that he was careful to assess Defendant for that time frame, because the doctor wanted to know Defendant's mental status during the interrogation by the police.

Dr. Coyle testified that at the time of his interview by the police, Defendant was experiencing hallucinations, was extremely, severely depressed, and had recently attempted suicide by overdose

of his medications. Dr. Coyle testified that Defendant had just been released from a very brief hospitalization at Moccasin Bend, which, in Dr. Coyle's opinion, did not treat Defendant to the full extent. Dr. Coyle testified that Defendant was not ready for release from Moccasin Bend when he was discharged, and that Defendant had told his psychiatrist on the morning of his release that he was not ready to leave.

Dr. Coyle testified that Defendant's suicide attempt occurred around March 2, 2007. Dr. Coyle testified that his opinions were premised in part on his review of Defendant's Rhea County Medical Center records and Moccasin Bend medical records, as well as based on Dr. Coyle's interviews with Defendant in 2008. Dr. Coyle indicated that Defendant had described for him Defendant's mental health status as of March 2007. Dr. Coyle testified that Defendant told him that he had been convicted of prescription fraud, had been sentenced in early February 2007 and that Defendant had thirty days to report to the McMinn County jail for incarceration.

Dr. Coyle testified that he discussed the February and March 2007 events with Defendant during the doctor's first session with Defendant in January 2008. Dr. Coyle testified that he discussed the same events with Defendant during his other sessions with Defendant so that the doctor could ensure that the details remained consistent. Dr. Coyle testified that he made his diagnosis of Defendant after the January 2008 session and that he had confirmed that diagnosis "more recently."

Dr. Coyle testified that Defendant had told the doctor that he was addicted to pain medicine, that he was using pain medicine and benzodiazepines during the course of the trial on prescription fraud. Dr. Coyle testified that Defendant told him that his prescription fraud was initiated at the behest of a "command" hallucination, that Defendant had an auditory hallucination that he could just

27

copy the prescriptions and use the copies to obtain more opiates.

Dr. Coyle testified that Defendant had suffered from chronic pain over the course of his life, that he had been treated with opiates for the pain, and that Defendant became more and more addicted to the medication. Dr. Coyle testified that by March 2007, Defendant had received no treatment for his for his addiction and had no hope of being able to deal with his substance problem. Dr. Coyle testified that Defendant's chronic pain also played a factor in his depression and hopelessness. Dr. Coyle testified that Defendant told him that life might be worth living if Defendant only suffered from the depression and not the pain, but would not be worth living if he suffered from only the pain and not the depression.

Dr. Coyle testified that Defendant told the doctor that he had considered drug rehab during the thirty day period he had to report to jail after his sentencing in February 2007, but that he discarded that idea and instead intended to kill himself. Dr. Coyle indicated that Defendant did not share his plans with anyone, including his wife. Dr. Coyle testified that Defendant spent the month of February trying to gather enough pills for a successful suicide attempt. Dr. Coyle reiterated that all of his information was based on his discussions with Defendant.

Dr. Coyle testified that Defendant was placed on Remeron, an antidepressant, while at Moccasin Bend. Dr. Coyle indicated that Defendant first received 15 mg of Remeron, which was then increased to 30 mg, but stated that the Remeron was not continued during Defendant's subsequent incarceration. Dr. Coyle opined that Remeron, alone, would not be successful in treating Defendant, but that Defendant instead needed both an antidepressant and an antipsychotic.

Dr. Coyle testified that Defendant's mental condition could have affected his March 2007 interview by law enforcement. Dr. Coyle testified that Defendant had no hope of being able to deal

with his addiction problems, with his depression, or with his situation, but instead just wanted to die. Dr. Coyle testified that at each of his three sessions with Defendant, Defendant wished that he had succeeded at his suicide attempt. Dr. Coyle testified that Defendant told the doctor that he was actively hallucinating during the interview, and that he was having a hard time staying focused because of the hallucinations. Dr. Coyle testified that Defendant told him that when the officers told him that they had detained his wife, that triggered an extreme response. Dr. Coyle stated that Defendant suffered from psychotic symptoms, a hallucination, directly related to what he needed to do to get his wife out of trouble.

Dr. Coyle testified that Defendant did not start receiving the Duloxetine and Risperdal until after January 2008, but that the drugs had helped to some extent. Dr. Coyle opined that the dosage of the two should be increased and indicated that he had advised Dr. Tenneson of his opinion.

Dr. Coyle testified that he has also reviewed the records of Dr. Katie Smith, a psychologist who has performed some psychological testing of Defendant, and that he has also spoken directly with Dr. Smith about her results. Dr. Coyle testified that Dr. Smith found no evidence of malingering, and that her testing confirmed Dr. Coyle's findings of substance abuse and psychotic depression. Dr. Coyle testified that he had prepared a report as to Defendant's mental condition. The report was entered under seal into evidence as Exhibit 9.

On cross-examination, Dr. Coyle reiterated that he has met with Defendant three times, once each in January, February and May of 2008. Dr. Coyle testified that his opinions were based upon a combination of Defendant's medical records and the doctor's conversations with Defendant, but agreed that he had not seen Defendant prior to 2008.

Dr. Coyle again testified that while at Moccasin Bend, Defendant was placed on the

antidepressent Remeron, but indicated that an antidepressant usually takes several weeks to take effect, so the doctor opined that the Remeron would not have had much of an antidepressent effect during defendant's interview with law enforcement. Dr. Coyle testified that he did not believe Defendant was prescribed Remeron on discharge.

Dr. Coyle testified that Defendant minimized his psychotic symptoms while at Moccasin Bend, that Defendant was too embarrassed and afraid to tell the Moccasin Bend staff about the symptoms. Dr. Coyle testified that it is common for a patient to minimize psychotic symptoms out of a fear of being seen as crazy. Dr. Coyle testified that Defendant was also still very focused on his addiction, and that played into Defendant's decision to minimize his psychotic symptoms. Dr. Coyle  agreed that the Moccasin Bend records most likely would not reference any psychotic symptoms because of Defendant's attempts to minimize them, but stated that he would need to review the records again to be certain.

Dr. Coyle testified that his information as to psychotic symptoms comes from 2008, but that he trusted Defendant's report as to his mental status in March 2007. Dr. Coyle testified that he believed Defendant's report that he was hallucinating during his interview with the police and believed that Defendant was threatened with the incarceration of his wife. Dr. Coyle testified that if Defendant had not been threatened with his wife's incarceration, that would make a difference in his opinions, since it was that threat that triggered some of Defendant's increased symptoms.

Dr. Coyle testified that Defendant was also suffering from withdrawal symptoms from the drugs he overdosed on, including Valium and ephedrine. Dr. Coyle testified that he believed that Defendant was treated with opiates for pain while at Moccasin Bend, and opined that he would not have treated Defendant with opiates, other than to offer something for detox, because of Defendant's

drug addiction. Dr. Coyle testified that he did not know for sure whether Defendant was still suffering from the effects of the drugs at the time of Defendant's interview by the police.

Dr. Coyle testified that he did not believe that Defendant had been Mirandized, but indicated that if he had, that would have changed his opinion. Dr. Coyle testified that Defendant told him that his experience at the RCSD was very different from his past experience with the police, because when he was confronted by police on his prescription fraud charges, Defendant understood what was happening. Dr. Coyle testified that Defendant told him that Defendant did not understand what was happening when he spoke with police at the RCSD. Dr. Coyle testified that Defendant was able to recite most, but not all, of the Miranda warnings to the doctor during one of the doctor's sessions with Defendant.

Dr. Coyle testified that he did not tape any of his sessions with Defendant. Dr. Coyle indicated that he didn't feel the need. Dr. Coyle indicated that Defendant's drug overdose was clearly documented, both by the Rhea County Medical Center and Moccasin Bend, as a suicide attempt.

On redirect, Dr. Coyle was presented with a copy of a psychiatric evaluation, dated March 4, 2008, from Defendant's medical records from Moccasin Bend. Dr. Coyle indicated that the record stated that there was "no evidence of psychosis." Dr. Coyle testified that he disagreed with that diagnosis, and stated that he did not believe that the Moccasin Bend staff developed much of a "treatment alliance" with Defendant, and that such an alliance is necessary for a patient to feel comfortable talking about embarrassing subjects with a doctor.

The Court then asked Dr. Coyle whether his opinion relied on the veracity of Defendant's statements as to the events of March 7, 2007. Dr. Coyle testified that his opinion did rely on the

accuracy of Defendant's statements. The witness was then excused.

**F.    Testimony of Jeffrey D. Jones**

Next, the Defendant elected to testify. Prior to allowing the Defendant to testify, the Court confirmed that Defendant understood that he had the right to remain silent and that if he elected to testify he would, at least in part, be giving up that right. The Defendant confirmed that he understood his rights. Defense counsel also confirmed that he had discussed the relevant legal issues with Defendant.

Defendant testified that in the period of 2005 to 2006, he was arrested for prescription fraud for using forged prescriptions to obtain drugs such as Percocet, Soma, and Valium for personal use. Defendant stated that he was highly addicted to such medications and that his addiction progressed during the period of 2005 to 2006, to the point where he was taking thirty to forty pills a day.

Defendant testified that, in early March 2007, he was expected to turn himself in to begin serving his jail sentence, but instead decided to commit suicide. Defendant testified that on approximately March 2, 2007, he took a combination of several Percocet and Soma, as well as two to three hundred Valium over the course of the day. Defendant stated that the pills caused him to pass out, at which point he was taken to the emergency room at the Rhea County Medical Center ("RCMC") where his stomach was pumped and he was placed in the ICU. Defendant testified that he did not recall being brought to the RCMC, nor was he certain how long he stayed there, but that he was told that he stayed at the RCMC for two days.

Defendant testified that, while at the RCMC, a social worker suggested that he admit himself to Moccasin Bend for a mental evaluation, which he did. Defendant stated that he was still suffering from the effects of the overdose while at Moccasin Bend, so he was not certain how long he was

there, but he believed that he was at Moccasin Bend for three to four days. Defendant testified that he was placed on a prescription medication for his depression while at Moccasin Bend. Defendant stated that he was still in a neck brace at the time, and suffering from neck pain, so he was also given pain medication, such as Percocet or hydrocodone, while at Moccasin Bend. Defendant testified that he was told that the officers who picked him up from Moccasin Bend were given medication for Defendant to take for his pain and his depression.

Defendant testified that he was taken from RCMC to Moccasin Bend in a patrol car, accompanied by his brother. Defendant said that at Moccasin Bend, he noticed that his paperwork was marked "Legal Hold," so he believed that the was going to be arrested for the prescription fraud charges and taken to McMinn County. Defendant testified that when he left Moccasin Bend, he was picked up by a Rhea County patrol car, not McMinn County, and was taken to the Rhea County jail. Defendant stated that, upon reaching the jail, he was met by Agent Waggoner, Detective Potter, and a third agent whose name he did not know. Defendant testified that he asked to speak with his attorney, but was told that he could speak to an attorney after the officers were through with him.

Defendant testified that he told the officers that if they were going to talk, they should at least tape record the conversation, but the officers told Defendant that they would remember what was said. Defendant testified that the officers told him about a bombing in Sweetwater, to which Defendant again asked to speak with his attorney, Randy Rogers.[3] Defendant stated that the officers started talking about the bombing and that Agent Waggoner described Defendant's Residence. Defendant testified that Agent Waggoner even described the freezer in Defendant's basement.

---

[3]Mr. Rogers represented Defendant on the prescription fraud charges described above but is not Defendant's attorney of record in the instant case.

Defendant indicated that he kept the freezer locked because the seal leaked, but Agent Waggoner described Defendant as arrogant for keeping it locked in an attempt to keep people out of it.

Defendant testified that the officers told him they had found a piece of pipe in the basement, and told Defendant that his wife was in custody at the Residence, was in handcuffs, and was crying. Defendant stated that he was told that it did not matter whether the officers charged him or his wife, that they would charge one or the other. Defendant testified that upon hearing about his wife, he just gave up and told the officers that they might as well just charge him. Defendant testified that he was not read his Miranda rights.

Defendant testified that after agreeing to confess, he, at first, was not very cooperative because he did not know the details to tell the officers. Defendant stated that the officers took a break, leaving just Detective Potter and Defendant in the room. Defendant testified that Detective Potter told Defendant to "man up" and to give the officers the details, and that if he did, the detective would attempt to get his prescription filled. Defendant stated that when the officers returned, he tried to give them details.

Defendant testified that the officers were talking during the interview, and that one of them mentioned that you can buy black powder at Wal-Mart, so that is why he said that he got the powder at Wal-Mart. Defendant stated that he told the officers that he got the fuses from firecrackers, but the officers said those fuses would be too short and started talking about M-80 firecrackers, so Defendant stated that he used fuses from M-80s and taped them together. Defendant testified that he did write the statement marked as Exhibit 4.

On cross-examination, Defendant testified that the waiver of rights [Exhibit 4] was not read to him, but he did sign it, though he signed it at around the same time that he made the hand written

34

statement on the opposite side. Defendant testified that he signed the waiver without reading it because he wanted to get things done so that his wife would be released. Defendant stated that he did not know what time he signed the waiver, and that the other portions of the waiver were not filled in when he signed it.

Defendant agreed that he wrote the statement on Exhibit 4 and signed his name, but testified that he did not perform the acts described in the statement, but only wrote that to help his wife. Defendant was then read portions of the third numbered paragraph of Exhibit 5 which indicated that Defendant first denied knowledge of the bombing, but confessed to Detective Potter after Agent Waggoner left the room. [Exhibit 5] Defendant testified that the report was incorrect, because Defendant admitted to the charges as soon as the officers told him his wife was in custody. Defendant testified that the Agent Waggoner told him his wife was in custody, handcuffed and crying, soon after he arrived at the RCSD.

Defendant was next read the portion of Exhibit 5 that indicated that Defendant told the officers he had bombed the impound lot because he was angry with the SPD, that he had constructed at least three destructive devices, and that Defendant referred to the devices as pipe bombs. [Exhibit 5] Defendant testified that he never told the officers that he was angry with the SPD, nor did he tell the officers that he had constructed three bombs, but rather that officers had made up both of those statements. Defendant testified that the officers told Defendant that the devices were pipe bombs, not that he had been the first to describe them as pipe bombs.

Defendant was then read the portion of the report describing Defendant's purchase of gun powder from Wal-Mart and use of M-80 fuses. [Exhibit 5] Defendant testified that he did say those things, but only after the officers had discussed those as being possible sources of gun powder and

fuses. Defendant was then read the portion of the report which indicated that Defendant used the tools in his basement to make the bodies and then assembled the bombs in the shed behind his house. [Exhibit 5] Defendant testified that the officers made up these facts, but agreed that he was a machinist and knew how to use a lathe and how to work metal.

Defendant was then read the portion of the report which indicated that he had thrown away the empty gun powder cannister. [Exhibit 5] Defendant testified that the officers made up that fact. Defendant was then read the portion of the report which indicated that Defendant advised the officers that he was a trained machinist and had learned how to create bombs by watching television. [Exhibit 5] Defendant testified that he did tell the officers he was a machinist, but that the officers made up the fact that Defendant learned how to create bombs from television. Defendant also denied telling the officers that he had made the destructive devices found in his basement.

Defendant was next read the portion of the report which indicated that Defendant knew where his truck was located in the impound lot because he had previously been to the lot to remove personal items from his truck. [Exhibit 5] Defendant agreed that the had previously been to the lot, but stated that had been several months earlier and that he would not have been able to locate the truck again on his own. Defendant was read the portion of the report that indicated that he had taken the bombs in his green Chevrolet SUV to the SPD impound lot. [Exhibit 5] Defendant agreed that he had access to a green S-10 Blazer, but denied telling the officers that he had driven to the impound lot.

Defendant was then read the portion of the report which indicated that he had lit the bombs, thrown them at his impounded truck, and then drove off before the bombs exploded. [Exhibit 5] Defendant agreed that, as part of the confession, he did tell the officers that. Defendant was read

the portion of the report which indicated that he had attempted to destroy the vehicle to get revenge on the SPD [Exhibit 5], but Defendant denied saying that. Defendant was then read the portion of the report which indicated that he denied any knowledge of the incendiary device or the white PVC piece found in the lot [Exhibit 5], and defendant agreed that he told the officers he did not know anything about those. Defendant agreed that he told the officers that his wife was not involved in the bombing.

Defendant testified that he did tell the officers that he committed the bombing and had made the devices, but further testified that he only admitted to those actions to get his wife out of custody. Defendant testified that Agent Waggoner told him that his wife was in custody at the Residence, in handcuffs and crying, so Defendant admitted to the crimes. Defendant denied being read his Miranda rights. Defendant testified that Detective Potter told him they would get his medication filled if he cooperated. Defendant indicated that he was supposed to have been given two prescriptions, one for pain and one for depression, that the prescriptions were supposed to have been given to the officers. Defendant testified that he had been given medication on the morning of his release from Moccasin Bend, but he did not recall what time. The witness was then excused.

## G. Testimony of Jennifer Jones

Defendant next called Mrs. Jones. Mrs. Jones testified that she is the wife of Defendant, that she has known the Defendant for approximately eighteen years and has been married to him for approximately sixteen years. Mrs. Jones testified that Defendant had been taking prescription medications since he was in his early twenties, and that the amount of medication Defendant took increased between 2005 and 2007. Mrs. Jones testified that in early 2007, Defendant was very depressed and had little energy or appetite, that he did not do much of anything.

37

Mrs. Jones testified that for a few days preceding March 2, 2007, Defendant had not felt well. Mrs. Jones stated that on the evening of March 2, 2007, while Defendant was getting ready for bed, Mrs. Jones heard a noise from the bathroom, where she found Defendant collapsed and unresponsive. Mrs. Jones testified that she tried to wake Defendant, but could not, so she called Defendant's mother, and then they called 911. Mrs. Jones stated that an ambulance came and took Defendant to RCMC.

Mrs. Jones testified that when she first saw Defendant at RCMC, he could not breathe on his own, so he was placed on a ventilator. Mrs. Jones indicated that tests were performed on Defendant and that the doctors determined that he had overdosed on medication. Mrs. Jones testified that Defendant was at the RCMC the whole weekend.[4] Mrs. Jones stated that, while at RCMC, a social worker spoke with Defendant about his depression and about being admitted to Moccasin Bend for evaluation. Mrs. Jones testified that she saw Defendant one time while he was at Moccasin Bend, on March 7, 2007, at approximately 1:00 or 1:30 p.m. Mrs. Jones testified that she knew Defendant was being released from Moccasin Bend at that point, and that he was being going to be transported to the Rhea County jail.

Mrs. Jones testified that on the evening of March 6, 2007, Agent Foster and a RCSD deputy came to her house and told her that they wanted to search the Residence, grounds, and vehicles because they had reason to believe that someone might be out to hurt Defendant or a family member. Mrs. Jones was then shown the consent forms previously marked as Exhibits 2 and 3. Mrs. Jones identified the documents as consent forms given to her by Agent Foster on March 6th and indicated that she had signed the forms. Mrs. Jones testified that Agent Foster never told Mrs. Jones that her

---

[4]The Court takes judicial notice of the fact that March 2, 2007, was a Friday.

husband was a suspect. Mrs. Jones testified that the officers did search the vehicles that night. Mrs. Jones testified that Agent Foster told her that he would like to return the next day to search the house.

Mrs. Jones testified that on the next day, March 7th, officers again came to the Residence: Agents Waggoner and Foster and Detective Bice. Mrs. Jones stated that when the officers first arrived, she was alone at the residence, but that soon afterwards her mother-in-law, Ms. Clayton, and brother-in-law, Tim Jones, arrived. Mrs. Jones testified that the officers asked her to consent to a search of the Residence. Mrs. Jones testified that she asked what would happen if she did not consent, and was told that the officers would get a warrant. Mrs. Jones testified that she was never told that Defendant was a suspect, but rather that the officers just wanted to perform a quick search to make sure everything was alright.

Mrs. Jones testified that she did consent to the search, and that she and Ms. Clayton both signed the consent form. Mrs. Jones testified that after she signed the consent, the officers started searching and that other officers and investigators began arriving. Mrs. Jones testified that the search lasted approximately four to five hours.

On cross-examination, Mrs. Jones reiterated that she was at Moccasin Bend at approximately 1:00 or 1:30 p.m. and that she knew that Defendant was going to be taken to the Rhea County jail. Mrs. Jones testified that Agent Foster did come to her house the previous evening but indicated that she did not remember Agent Foster telling her that her husband was a suspect. Mrs. Jones stated that Agent Foster searched outside the house, including the outbuildings and vehicles, and agreed that Agent Foster took a sample of wire found in one of the outbuildings. Mrs. Jones agreed that she signed two consent forms that evening. [Exhibits 2, 3]

Mrs. Jones testified that the day after Agent Foster's evening visit, she went to Moccasin Bend at approximately 1:00 p.m. and then returned to the Residence, and that some time that afternoon the other officers came to the Residence and asked to search inside. Mrs. Jones agreed that she signed a consent form to allow the search. [Exhibit 1] Mrs. Jones testified that she was not told that her husband was a suspect in the case. Mrs. Jones agreed that she was told she did not have to sign the consent, but indicated that she was told that if she did not, the officers would get a search warrant. Mrs. Jones testified that she did not recall it being Ms. Clayton who said that the officers could get a search warrant if she did not consent.

Mrs. Jones testified that she was not told that her husband was a suspect and denied making a statement to the effect that her husband would not make bombs. Mrs. Jones also denied making a statement to the effect that she guessed he did make bombs when she was shown bombs in the basement. Mrs. Jones testified that she was shown something in the basement, but that she could not testify that it was a bomb. When asked to describe the items she saw, Mrs. Jones testified that she "saw something" and that she could not say that they were pipe bombs. Mrs. Jones agreed that she was told to wait outside after that and that the bomb squad was brought in.

Mrs. Jones agreed that Agent Waggoner read the consent form marked as Exhibit 1 to her. Mrs. Jones agreed that some pills with Ms. Clayton's name on them were found in their basement. Mrs. Jones testified that Ms. Clayton had left them there, but Mrs. Jones indicated that she did not know the name of the medications. The witness was then excused.

## H.     Testimony of Timothy Keith Jones

The Defendant next called Timothy Keith Jones. ("Tim Jones") Tim Jones testified that he is the brother of Defendant and that, in March 2007, he lived a few miles away from the Residence.

Tim Jones testified that, in early March 2007, while driving home from his mother's house, he received a call to go to the Residence. Tim Jones testified that upon arriving at the Residence, he found Defendant lying in the bathroom, almost unconscious. Tim Jones stated that after yelling at Defendant, Defendant would mumble in response. Tim Jones indicated that Defendant had a yellow liquid oozing from his mouth.

Tim Jones testified that they called 911 and that an ambulance came and took Defendant to the RCMC. Tim Jones testified that he did see Defendant at the RCMC soon after his admission. Tim Jones indicated that Defendant had been placed on a ventilator, that he was semi-conscious, and that he was struggling to remove the ventilator tube, so the staff had to restrain him. Tim Jones indicated that the ventilator was keeping Defendant alive and that the doctors indicated that they had given Defendant enough medication to knock out an elephant, but he was still struggling.

Tim Jones testified that some time later, Defendant was transferred from the RCMC to Moccasin Bend, so he rode with Defendant during the transport. Tim Jones indicated that, when transferred, Defendant was very compliant and didn't seem to resist the idea of going to Moccasin Bend. Tim Jones testified that Defendant slept most of the way to Mocassin Bend.

Tim Jones testified that a few days later, he received a call from Mrs. Jones asking him to come to the Residence because some officers wanted to come over to investigate in relation to events in Monroe County. Tim Jones testified that he met the officers at a nearby church and then led them to the Residence. Tim Jones testified that, upon arriving at the Residence, the officers indicated that "perhaps [Defendant] had been involved in some stuff and someone might be out to get him," so the officers wanted to check his vehicles to see if there might be anything there that was dangerous. Tim Jones indicated that he did not hear any indication that Defendant was a suspect.

41

Tim Jones testified that after that, he led the officers to his mother's house, because the vehicle Defendant had been driving was there. Tim Jones indicated that he was present when the officers searched that vehicle, as well as when they searched outside the Residence. Tim Jones testified that while they were searching outside the Residence, he indicated that they should check Defendant's tractor, as that would be a likely target if someone wanted to hurt Defendant, and indicated that the officers did perform a cursory examination of the tractor. Tim Jones stated that the officers then asked if he could let them in a shed at the Residence, which he did. Tim Jones testified that the officers asked if they could take a piece of wire from the shed to compare to something, and he said that they could.

Tim Jones testified that the officers spoke with Mrs. Jones again as they were leaving and said that they would like to search the house, but because of the late hour they would come back the next day. Tim Jones stated that he and Mrs. Jones asked whether it would be safe for Mrs. Jones to stay in the house that night, and the officers indicated that it would, but that they wanted to return the next day to make sure everything was safe.

Tim Jones testified that on the next day, March 7th, he was not present when the officers arrived. Tim Jones indicated that he was finishing up at work when he received a phone call from his mother asking him to come to the Residence because "it was turning into a three-ring circus." Tim Jones testified that, upon arriving, there were law enforcement officials everywhere.

Tim Jones testified that, later that day, Agent Waggoner told him that Defendant had confessed, but that the officers did not believe that Defendant had acted alone, so Agent Waggoner strongly suggested that the family use whatever influence they had to get Defendant to cooperate and give up his accomplice.

42

On cross-examination, Tim Jones testified that he was not there when Mrs. Jones consented to the search of the Residence. Tim Jones testified that when he saw so many people searching, he knew that the officers suspected Defendant. Tim Jones indicated that he was present on the night of March 6th when Agent Foster searched, but that Agent Foster did not say that Defendant was a suspect. Tim Jones testified that he was with the agents the entire time. Tim Jones agreed that the officers asked if they could take a piece of wire from the shed. Tim Jones testified that request raised some red flags, but that, up until this episode, he trusted law enforcement, so he believed the officers. Tim Jones testified that he did not know at that time that his brother was a suspect. The witness was then excused.

I.    **Testimony of Mary Jones Clayton**

The Defendant next called Ms. Clayton, the mother of Defendant and Tim Jones. Ms. Clayton testified that in early March 2007, Defendant attempted to commit suicide. Ms. Clayton testified that Mrs. Jones called her and asked her to come to the Residence. Upon arriving, Ms. Clayton found Defendant in the bathroom, passed out. Ms. Clayton testified that they called 911 and an ambulance came and took Defendant to the RCMC where he was intubated because he could not breathe unaided.

Advancing to the events of March 6, 2007, Ms. Clayton testified that she believed that Defendant had been transferred to Moccasin Bend by that time. Ms. Clayton testified that on March 6, 2007, Agent Foster called her and said that they thought that someone might be trying to hurt Defendant, so they wanted to come to the Residence to make sure everything was okay. Ms. Clayton testified that the agent did not indicate that Defendant was a suspect. Ms. Clayton testified that she called Mrs. Jones, Defendant, and Tim Jones and told them that she had received the call

43

and that she was suspicious that it was a legitimate call. Ms. Clayton testified that there was discussion of the Chevy Blazer, because her husband had been taking care of it, so if there was a safety issue they might want to search it. Ms. Clayton testified that she was working March 6th, so she was not present at the Residence.

Ms. Clayton testified that she did go to the Residence on March 7th, and that when she arrived, Agent Foster, Detective Bice and a third agent were standing on the deck of the house with Mrs. Jones. Ms. Clayton stated that the officers were telling Mrs. Jones that they wanted to enter the house to search because they were concerned about Mrs. Jones' safety. Ms. Clayton testified that she did not hear the officers say that Defendant was a suspect. Ms. Clayton testified that after Mrs. Jones signed the consent, the officers told them that they suspected Defendant had made a bomb, so they and other officers began to search.

Ms. Clayton testified that at some point Agent Waggoner did leave the residence and later returned. Ms. Clayton testified that after everyone was forced to leave the house, she was waiting behind the house and that the Rhea County Sheriff, Mike Neal, was standing nearby. Ms. Clayton indicated that Agent Waggoner walked up to the Sheriff and told him that they had obtained a confession from Defendant and that they had done so by telling Defendant that they had placed Mrs. Jones in handcuffs, were going to take her to jail, and that she was.

On cross-examination, Ms. Clayton testified that she did not hear Agent Waggoner read the consent form to Mrs. Jones, but instead he just told her what it was. When asked whether she heard any of the officers or agents tell Mrs. Jones that her husband was a suspect, Ms. Clayton testified that she did not. Ms. Clayton reiterated that she heard Agent Waggoner tell the Sheriff that they had obtained a confession from Defendant by telling Defendant that Mrs. Jones had been handcuffed and

44

was crying. Ms. Clayton indicated that she was not lying. Mrs. Clayton testified that some pills that belonged to her were found in the Residence. Mrs. Clayton indicated that the Residence actually belongs to her, so she didn't see a problem with that, and indicated that the pills were not narcotics, but were instead a stomach pill and an antibiotic.

Next, the Court asked Ms. Clayton whether she had said that she witnessed Mrs. Jones sign the consent form and that afterwards the officers told them that they suspected Defendant of making a bomb, to which Ms. Clayton indicated that was correct. The Court next asked Ms. Clayton if, on cross-examination, she later testified that she never heard the officers indicate that Defendant was a suspect, to which she responded that she meant that when the officers first came to the Residence they did not indicate Defendant was a suspect. The Court next asked Ms. Clayton what time she heard Agent Waggoner make the statements to the Sheriff, to which she testified that it was approximately 5:30 p.m. or so. The witness was then excused. This concluded the presentation of evidence for the June 3rd hearing.

## II.    SUMMARY OF TESTIMONY: SEPTEMBER 4, 2008, HEARING

As noted above, the Court reopened evidence to allow the presentation of testimony from Defendant's treating physician from Moccasin Bend and to allow rebuttal testimony from Dr. Coyle. [Doc. 48] The Court conducted an evidentiary hearing on September 4, 2008, to hear such evidence.

### A.    Testimony of Dr. Sarath Gangavarapu

The government called as its first witness Dr. Sarath Gangavarapu ("Dr. Sarath"). Dr. Sarath testified that most people referred to him simply as Dr. Sarath. Dr. Sarath testified that he is a board certified Psychiatrist, that he works at Moccasin Bend, that he possess a medical degree, and has completed a four year residency in psychiatry. Dr. Sarath testified he has been in practice for

45

approximately twenty-three years, including past experience as the Medical Director for Hiawassee Mental Health Center in Cleveland, Tennessee, and some time in private psychiatric practice. Dr. Sarath stated that he has also been working with Moccasin Bend for the past six years. At this point, Dr. Sarath was tendered as an expert in psychiatry.

Dr. Sarath was then shown a group of documents later entered into evidence as Exhibit 10.[5] Dr. Sarath identified Exhibit 10 as a portion of Defendant's medical records from Moccasin Bend, including a discharge summary. Dr. Sarath testified that the discharge summary was dictated by another person who reviewed the records, but that the summary was based on Dr. Sarath's treatment notes. Dr. Sarath testified that he treated Defendant at Mocassin Bend, that Defendant was admitted on March 4, 2007, was discharged on March 7, 2007, and that Dr. Sarath treated Defendant during that time. Dr. Sarath testified that he saw Defendant approximately four times, once each day, including a brief session on the 7th. Dr. Sarath testified that on the 7th, he spoke with Defendant about his discharge and had his prescriptions ready for discharge.

Dr. Sarath testified that, based upon his treatment of Defendant, he prepared a report which included a psychiatric evaluation of Defendant, and that the report was included in Exhibit 10.[6] Dr. Sarath stated that Defendant's chief complaint was depression, and that Defendant had told the doctor that he was feeling stressed, had trouble sleeping, and had a low energy level. Dr. Sarath indicated that Defendant was both anxious and depressed. Dr. Sarath testified that, at the time, he diagnosed Defendant with substance-induced mood disorder because of the medications Defendant

---

[5]Exhibit 10 contains 8 total sheets of paper, of which the first seven are double sided and the final sheet is single sided.

[6]The sixth and seventh double sided sheets of paper in Exhibit 10, labeled "Psychiatric Evaluation."

was taking, including hydrocodone.

Dr. Sarath testified that Defendant tested positive for anxiolytics, a class of anti-anxiety medications, and specifically for benzodiazepine. Dr. Sarath stated that Defendant told him that he had been taking Xanax, which is a benzodiazepine, but that Xanax had at first not been included on the list of medications defendant was taking. Dr. Sarath testified that Defendant also tested positive for methamphetamine. Dr. Sarath indicated that Defendant did not receive those drugs at Moccasin Bend, but that Defendant had taken them sometime before arriving.

Dr. Sarath testified that those were the only two classes of drugs present in Defendant's drug screen, benzodiazepine and methamphetamine. Dr. Sarath opined that those drugs could cause someone to become confused in two separate ways: either by an intoxicating effect or by withdrawal symptoms, which could cause a state of delirium and confusion. Dr. Sarath indicated that he never saw Defendant in a delirious state. Dr. Sarath testified that, depending on what benzodiazepine Defendant had taken, it might have still been affecting him. Dr. Sarath indicated that Xanax is a very short lived benzodiazepine, and that it would probably not have been affecting Defendant upon release, but that Valium is a longer lasting benzodiazepine. Dr. Sarath testified that the staff did not observe any confusion in Defendant while he was at Moccasin Bend, so he did not believe that Defendant had enough benzodiazepine in his system on March 7th to cause confusion.

Dr. Sarath testified that Defendant was depressed, but indicated that he did not believe Defendant suffered from "very severe depression." Dr. Sarath stated that he diagnosed Defendant with substance-induced mood disorder, but also included a differential diagnosis of depression disorder. Dr. Sarath indicated that he saw no signs of psychosis during his care of Defendant and that Defendant denied having any hallucinations. Dr. Sarath testified that Defendant told him that

47

he took an overdose of hydrocodone in a suicidal attempt, but Dr. Sarath indicated that Defendant told his social worker that it was not really a suicide attempt.

Dr. Sarath confirmed that Defendant's medical records indicate that on March 6, 2007, Defendant indicated that he wanted to go home and that the medicine was helping, so the doctors increased his dosage of Remeron, and on March 7, 2007, Defendant denied being suicidal and he was released to the Rhea County jail. [Exhibit 10] Dr. Sarath testified that he had placed Defendant on 15 mg of Remeron and then increased it to 30 mg. Dr. Sarath stated that it would be difficult to say if that was the correct dosage of Remeron for Defendant. Dr. Sarath testified that it normally takes a couple of weeks to really tell how well an antidepressant is working, but that in a hospital situation the dosage can be increased more quickly because the patient is being observed so closely. Dr. Sarath testified that Remeron is sedating, and that, because of the sedating effect, Remeron was taken at bedtime. Dr. Sarath stated that, because of Defendant's complaints of low energy, loss of appetite, and difficulty sleeping, the doctor felt that taking Remeron at night might help with that, and that Remeron also tends to increase appetite.

Dr. Sarath confirmed that any Remeron Defendant took would have been taken the night of the 6th, not the morning of the 7th. Dr. Sarath testified that when he saw Defendant on the morning of the 7th, he was alert and oriented, and did not seem drowsy. Dr. Sarath testified that any drowsiness should have been more pronounced in the morning, so he would have noticed it if Defendant was going to suffer from drowsiness because of the Remeron. Dr. Sarath reiterated that Defendant denied having hallucinations and that the doctor had observed no signs of hallucinations during his treatment of Defendant.

Dr. Sarath testified that, while at Moccasin Bend, Defendant had been prescribed Remeron

48

for depression and Naprosyn for pain.  Dr. Sarath indicated that Naprosyn was prescribed as a PRN medication, that it was only to be taken as needed, and that he did not believe Defendant had actually been given any while at Moccasin Bend.  Dr. Sarath testified that Naprosyn was not a sedating agent, so it would not cause drowsiness, nor would it cause confusion.  Dr. Sarath testified that Defendant was also taking Zantac for acid reflux, but that Zantac would not affect Defendant's reasoning abilities and that, if it had, he would have noticed it when he saw Defendant before releasing him.

Dr. Sarath testified that Defendant was released on March 7th after lunch.  Dr. Sarath stated that he believed Defendant had lunch before leaving, but could not confirm that.  Dr. Sarath testified that Defendant was alert and "oriented x3" on the day of discharge and that his speech was clear and coherent.  Dr. Sarath explained that "oriented x3" means that Defendant was oriented to time, place, and person.  Dr. Sarath testified that Defendant was not treated with opiates while at Moccasin Bend.  Dr. Sarath again testified that he did not believe that the medications in Defendant's system at his admission to Moccasin Bend would have caused him to be confused on March 7th.

On cross-examination, Dr. Sarath testified that Moccasin Bend is a state facility that often handles acute cases, including suicide attempts.  Dr. Sarath indicated that Moccasin Bend is a very busy facility, and estimated that he probably admitted approximately seven to eight patients on March 4, 2007, and that the facility might see forty to sixty admissions over the course of a week.  Dr. Sarath testified that approximately eight or nine psychiatrists would have been working at Moccasin Bend in March 2007.

Dr. Sarath testified that he is responsible for the patients in Unit 5, and that he normally had approximately twenty patients in his unit.  Dr. Sarath was then shown a document titled Moccasin

49

Bend Discharged Client Face Sheet, which was later entered into evidence as Exhibit 11. Dr. Sarath indicated that Exhibit 11 showed that Defendant was admitted to Moccasin Bend at 10:35 p.m. on March 4, 2007. Dr. Sarath testified that Defendant was at Moccasin Bend for approximately four days, and that Defendant left around 1:00 p.m. on March 7, 2007, but that he was not certain of the exact departure time. Dr. Sarath testified that Defendant was started on Remeron on March 5, 2007.

Dr. Sarath testified that an intake interview requires a lot of paperwork, so intake usually takes about forty-five minutes to complete and is largely a question and answer session. Dr. Sarath testified that the discharge interview usually only takes about ten minutes, and then another thirty minutes to complete the paperwork. Dr. Sarath indicated that he was aware that Defendant was going to jail after being released. Dr. Sarath testified that he did not believe that the officers were en route during the discharge interview, but rather a social worker would contact the family or, in this case, the jail, to make travel arrangements after the discharge order had been signed. Dr. Sarath confirmed that the decision to discharge would have been made early on March 7th, probably around 8:00 a.m. Dr. Sarath testified that on March 6th he had discussed with Defendant that he would probably be discharged the next day.

Dr. Sarath testified that as a differential diagnosis, he diagnosed Defendant with depression NOS (not otherwise specified). Dr. Sarath testified that some of the types of depression specified in the DSM IV include manic depression, severe depression, severe depression with psychotic features, bipolar depression, and bipolar major depression. Dr. Sarath indicated that he sees a number of patients with a history of drug abuse or dependence who suffer from substance induced depression, but because it was possible that Defendant did not suffer from substance induced depression, the doctor included the differential diagnosis. Dr. Sarath testified that he placed

50

defendant on medication just in case the depressive disorder diagnosis was the present.

Dr. Sarath testified that he asks patients a series of questions to determine whether they suffer from a depressive disorder, including the patient's sleep pattern, energy level, appetite, suicidal behavior, crying spells, loss of interest in things, and similar questions. Dr. Sarath testified that Defendant's responses to most of those questions revealed that Defendant was showing signs of depression. Dr. Sarath indicated that he was concerned about Defendant's suicide attempt. Dr. Sarath confirmed that it is possible for someone suffering from depression to also suffer from psychosis. Dr. Sarath testified that Defendant initially minimized his drug use, and that he attempted to mask his drug problems. Dr. Sarath testified that he diagnosed Defendant with the substance abuse disorder, but also noted opioid dependence, amphetamine abuse, and anxiolytic abuse.

Dr. Sarath testified that when patients are being released to a jail, Moccasin Bend does not set up aftercare appointments for the patient, but instead notify the jail and let the jail set the appointments. Dr. Sarath testified that for inmates, they usually send a two-week supply of medication, a month's prescription, and a copy of Defendant's records to the jail's mental health center. Dr. Sarath testified that the officers who picked Defendant up should have been given the two-week supply of medication and prescriptions, as well as instructions to establish follow-up care. Dr. Sarath indicated that those arrangements are the responsibility of the social worker, so the doctor could not confirm that happened.

Dr. Sarath testified that in determining whether to diagnose psychosis, he asks a patient whether he is having auditory or visual hallucinations, whether he is delusional, whether he has any fear that some one is trying to kill him, and also watches for evidence that the patient is responding to something not present. Dr. Sarath testified that if a patient denies such symptoms, then the doctor

51

would rule out psychosis unless he saw other evidence of psychosis. Dr. Sarath indicated that there is no objective physical test to determine whether a patient is psychotic.

Dr. Sarath testified that there is psychological testing for psychosis, but that it is also based on questioning, and stated that Moccasin Bend generally does not perform that type of psychological testing except in cases of patients suffering from brain damage. Dr. Sarath confirmed that at Moccasin Bend they do not employ a written test to determine psychosis.

Dr. Sarath indicated that if he saw a patient reacting to an apparent hallucination, he would most likely find that indicative of psychosis. Dr. Sarath testified that the fact that Defendant was prescribed Risperdal would not necessarily be indicative of psychosis, because Risperdal is used to treat psychosis, but it can also be used as a mood stabilizer. Dr. Sarath testified that his initial assessment of Defendant included a differential diagnosis of malingering, but indicated that malingering was included as a differential diagnosis so that the staff would watch for that so that they could confirm or rule it out. Dr. Sarath testified that during intake, you look at all possible diagnosis, and agreed that Defendant was not diagnosed with malingering on discharge.

Dr. Sarath testified that it was difficult to assess whether a patient is malingering, and that it is often a problem with patients facing legal charges. Dr. Sarath indicated that was why he identified it as a possible diagnosis, so they could rule it out. Dr. Sarath emphasized that Defendant was not specifically diagnosed with malingering, but that it was listed so they could determine whether it was part of the problem.

Dr. Sarath testified that the social worker is generally responsible for performing a detailed social assessment, but the doctor did not recall seeing a detailed social assessment for Defendant. Dr. Sarath indicated that he did not perform a social history of Defendant, because that is the

responsibility of the social worker. Dr. Sarath testified that he did not discuss: Defendant's relationships with parents and siblings, other important relationships Defendant might have, whether Defendant had any children, Defendant's social network, spirituality, or financial support. Dr. Sarath stated that those issues are relevant to treatment, but that those matters fall under the responsibilities of the social worker. Dr. Sarath testified that Moccasin Bend uses a team approach, and that each member of the team has different responsibilities. Dr. Sarath stated that it would be important to find out about Defendant's social history, and that normally the social worker alerts the treatment team to any important issues. Dr. Sarath agreed that social issues would be important in diagnosing Defendant and in determining the best course of treatment.

Dr. Sarath testified that he has dealt with patients who were embarrassed by their psychotic symptoms and minimized them. Dr. Sarath indicated that sometimes drug dependent patients will minimize their problems so that they could get out of the hospital more quickly, but that others will exaggerate their symptoms to stay longer. Dr. Sarath agreed that a patient who felt like he was not being helped might wish to leave the hospital.

Dr. Sarath testified that he does remember Defendant and agreed that Defendant is a reserved person. Dr. Sarath indicated that he did not remember Defendant being very talkative and described Defendant as unassertive. Dr. Sarath stated that Dr. Lanade performed the physical examination of Defendant, and that Dr. Sarath did look at that results of the physical examination while treating Defendant. Dr. Sarath testified that he did not recall that Defendant had indicated that his aunt had died of breast cancer, but indicated that he would have seen that when he reviewed the report. Dr. Sarath testified that he was not aware that Defendant's aunt did not actually die of breast cancer, but that he just assumed it was true.

53

Dr. Sarath testified that the report also indicated that Defendant did not use tobacco, alcohol, or illicit drugs. Dr. Sarath stated that he was not aware that Defendant had used chewing tobacco for many years, but that he just had assumed that the report was accurate. Dr. Sarath testified that he assumes that the social worker did take a social history, but that he needed to find that out. Dr. Sarath agreed that if Defendant used tobacco, then he made a false statement to Dr. Lanade. Dr. Sarath testified that he had been told Defendant had drug charges and had used drugs.

Dr. Sarath testified that he did review Defendant's records from the RCMC. Dr. Sarath indicated that he did not know if he had seen the full records, but did recall looking at records relating to Defendant's admission for an overdose. Dr. Sarath testified that he was aware that Defendant was prescribed Ativan while at the RCMC, which Dr.Sarath described as a benzodiazepine, similar to Valium or Xanax. Dr. Sarath further testified that he was aware that Defendant had been placed on an IV while at the RCMC because of mild renal insufficiency, likely secondary to drug use. Dr. Sarath agreed that mild renal insufficiency could affect Defendant's ability to absorb drugs in his system and could affect how long the drugs remained in his system.

Dr. Sarath testified that Defendant was prescribed 15 mg of Remeron on March 5th, that on March 6th, Defendant stated that the medicine was helping and that he wanted to go home, and that in response the Remeron was increased to 30 mg. Dr. Sarath stated that he normally aims for a 30 mg dosage with Remeron and that, in an outpatient setting he would not adjust the dosage so quickly, but in an inpatient setting he tries to reach the therapeutic dosage more quickly. Dr. Sarath indicated that it normally takes a 30 to 45 mg dosage to be effective. Dr. Sarath testified that he would not dispute a manufacturer's recommendation that a doctor should wait one to two weeks before changing a dosage.

Dr. Sarath testified that on March 6th, the staff had decided to discharge Defendant the next day. Dr. Sarath indicated that occurred on the third day Defendant was at the facility. Dr. Sarath agreed that the side effects of Remeron include abnormal thinking, sleepiness, and dizziness. Dr. Sarath testified that the officers who picked up Defendant should have been given a list of the medications that Defendant was discharged under, but that that is the responsibility of the discharge social worker. Dr. Sarath stated that he believed the social worker would have done that, but he did not know. Dr. Sarath testified that he did not know whether Defendant's family was informed that Defendant would be taking Remeron.

Dr. Sarath testified that Defendant probably had group therapy a couple of hours per day while at Moccasin Bend, but that he did not believe Defendant had any individual psychotherapy. Dr. Sarath testified that Defendant would have received some alcohol and drug education while there, probably about an hour's worth.

Dr. Sarath testified that he first met Defendant on March 4, 2007, at about 10:30 p.m. and that it was probably sometime after midnight before Defendant was done with intake and in the unit. Dr. Sarath testified that Defendant would not have seen the treatment team that night, that those meetings always occur during the day. Dr. Sarath testified that Defendant would have started working with the treatment team on March 5th, and that on March 6th the decision was made that they would most likely discharge Defendant the next day.

Dr. Sarath testified that normally the entire treatment team meets with Defendant as a team, and that only during the psychiatric evaluation would the doctor meet with the patient without the team. Dr. Sarath testified that the discharge interview takes about ten to fifteen minutes, and that any paperwork would be prepared after the meeting. Dr. Sarath stated that meetings with the

treatment team would include the individual patient and the treatment team, not a group of several patients at once.

Dr. Sarath agreed that he had earlier testified that Defendant was "oriented x3" on discharge. Dr. Sarath also agreed that orientation can also be classified as "oriented x4", which would include awareness of the patient's circumstances. Dr. Sarath testified that he typically only puts down "oriented x3", that it was a habit. Dr. Sarath denied the inclusion of malingering as a possible diagnosis as a habit, but that he only includes malingering when he thinks it might be an issue.

Dr. Sarath testified that Defendant initially received a GAF (global assessment functioning) score of 22 out of a possible 100. Dr. Sarath was then shown a document titled Modified GAF Scale that was later entered into evidence as Exhibit 12. Dr. Sarath indicated that, under the scale in Exhibit 12, a score between 30 and 21 indicates that a person has an inability to function in almost all areas, including a serious impairment with work, school, or housework, serious impairment to judgment, inability to make decisions, confusion, and disorientation. Dr. Sarath testified that the primary reason for Defendant's score of 22 was the suicide attempt, that the score did not necessarily mean Defendant was confused. Dr. Sarath agreed that there were other factors that could be considered for that range of score, including hallucinations, delusions, and obsessional rituals.

Dr. Sarath testified that Defendant's discharge summary provided two GAF scores, a 24 and a 50. After reviewing the summary, Dr. Sarath testified that the 24 was most likely Defendant's score during his stay at Moccasin Bend, probably from March 5th, and that the score of 50 would have been at the time of discharge on March 7th. Dr. Sarath stated that score in the range of 41 to 50 indicates some serious symptoms in functioning. Dr. Sarath indicated that Defendant was not a 70 on the GAF scale when he left, which would be indicative of persistent mild symptoms, nor was

he a 90, which would be indicative of no symptoms or minimal symptoms.  Dr. Sarath testified that

the scale depicted in Exhibit 12 was the same scale Dr. Sarath normally used.

Dr. Sarath testified that he did not know how many pills Defendant took during his overdose.

Dr. Sarath indicated that Defendant told him that he took the overdose, but that he told the social

worker that it was accidental.  Dr. Sarath testified that the RCMC medical records indicate that

Defendant took an overdose.  Dr. Sarath agreed that he believed Defendant was minimizing his drug

use and that he did diagnose Defendant as a drug addict.  Dr. Sarath indicated that Defendant was

not receiving hydrocodone or any other benzodiazepines while at Moccasin Bend.  Dr. Sarath

testified that an addict could go through withdrawal and that Moccasin Bend has a withdrawal

protocol.  Dr. Sarath agreed that some symptoms of withdrawal can include delusions and psychosis.

On redirect examination, Dr. Sarath testified that the fact that the records show Defendant

as "oriented x3" and not "oriented x4" does not alter the doctor's opinion that Defendant was

coherent and clear thinking at the time of discharge.  Dr. Sarath stated that the reasons for

Defendant's GAF score of 50 on discharge included Defendant's legal problems and some

impairment in Defendant's mood, his depression.

On recross, Dr. Sarath testified that the GAF is not a mathematical computation, but instead

is a rough estimate of a patient's condition.  Dr. Sarath indicated that the fact that someone is only

one point away from the next category is not important, that they do not look at it in that way, since

it is just a rough estimate.  Dr. Sarath reiterated that Defendant went from a 22 on the night of his

admission, Sunday night, to a 50 at discharge on Wednesday.  Dr. Sarath agreed that Defendant did

not receive any medication on Sunday night, nor did he see the treatment team that night, but stated

that Defendant still could have been feeling better by Monday morning, that it was possible that he

had started talking to the staff.

On redirect, Dr. Sarath testified that, between the time of admission and the time of discharge, Defendant was feeling better. Dr. Sarath testified that while hallucinations and delusions are a possible factor in a GAF score of 50, Dr. Sarath never saw any evidence of those symptoms in Defendant.

On recross, Dr. Sarath testified that the GAF score of 50 was determined after the approximately ten minute exit interview, not before. The witness was then excused.

## B.     Rebuttal Testimony of Dr. Brent R. Coyle

The Defendant called Dr. Coyle in rebuttal to the testimony of Dr. Sarath. Dr. Coyle testified that the timing of each doctor's treatment of Defendant is important. Dr. Coyle stated that Dr. Sarath was working with a prospective analysis, while Dr. Coyle was working with a retrospective analysis. Dr. Coyle testified that there are other factors that are more important in determining whether a person can waive their Miranda rights, including establishing a sense of alliance with the patient. Dr. Coyle testified that he respects Dr. Sarath and the number of patients that he cares for, but testified that Dr. Sarath's patient load prevents him from doing anything other than basic care. Dr. Coyle indicated that he was concerned by Dr. Sarath's lack of knowledge and interest in Defendant's social history.

Dr. Coyle testified that when determining whether someone is psychotic, it is important to establish an environment where the patient feels comfortable talking about what he is experiencing. Dr. Coyle indicated that in such a situation, he would ask a patient if his mind ever played tricks on him, visions, voices, paranoia, suspiciousness. Dr. Coyle testified that he would not just come out and ask if the patient was suffering from hallucinations or delusions. Dr. Coyle testified that it was

58

unlikely you would discover symptomology with such a direct approach. The witness was then excused.

C.    **Rebuttal Testimony of Dr. Sarath Gangavarapu**

The government then recalled Dr. Sarath. Dr. Sarath testified that he never saw any evidence of psychosis during his treatment of Defendant. Dr. Sarath stated that he had a good rapport with patients under his care, that he is skilled at making patients feel comfortable. Dr. Sarath testified that his diagnosis is not just based on Defendant's denial of psychotic symptoms, but also on the fact that no one on the staff observed any signs of psychotic behavior.

On cross-examination, Dr. Sarath agreed that he had no way of knowing if Defendant was comfortable with him, and agreed that some patients do minimize their symptoms. Dr. Sarath indicated that part of his first forty-five minute meeting with Defendant involved filling out paper work. Dr. Sarath testified that he probably saw Defendant about fifteen minutes each on Monday and Tuesday, and about ten minutes during the discharge meeting on Wednesday, for a total of about one and a half hours of direct contact with Defendant.

On redirect, Dr. Sarath testified that other members of the staff spend time with the patients, including an activity therapist who meets with patients for an hour or two a day, as well as a group therapist and the nursing staff. Dr. Sarath estimated that the entire staff would have spent approximately ten to twenty hours with Defendant during his treatment at Moccasin Bend. The witness was then excused.

III.    **FINDINGS OF FACT**

Based on the evidence before the Court, the Court makes the following findings of relevant fact. In addition to these preliminary findings, the Court makes additional findings of fact in the

59

remainder of the opinion, as appropriate. For the sake of clarity, the Court begins with its findings as to the Defendant's medical treatment, and then addresses the investigation of law enforcement, including the interview of Defendant. The Court finds that on March 2, 2007, over the course of the day, Defendant took an overdose of pain medication. That evening Defendant collapsed, was found by his wife, and was transported by ambulance to the RCMC. Defendant was placed in intensive care at the RCMC, and on Sunday, March 4, 2007, Defendant was transported to Moccasin Bend.

Defendant arrived at Moccasin Bend at approximately 10:00 p.m. on the 4th, at which point Dr. Sarath conducted an intake interview with Defendant, lasting approximately forty-five minutes. Defendant was then placed under the ongoing care of Dr. Sarath and his treatment team. On March 5, 2007, Defendant was prescribed an antidepressant, Remeron, and was also prescribed pain medication, Naprosyn, as needed for his neck pain. On March 6, 2007, Defendant advised the staff of Moccasin Bend that the medication was helping and he was ready to return home. That same day, Dr. Sarath increased Defendant's dosage of Remeron and advised Defendant that he would most likely be discharged the following day.

On the morning of March 7, 2007, Dr. Sarath and the treatment team conducted a discharge interview with Defendant. During that discharge interview, Dr. Sarath observed no signs of confusion or drowsiness. Dr. Sarath and the treatment team decided to discharge Defendant, so the RCSD was contacted by someone at Moccasin Bend to arrange for transport. Defendant was picked up by RCSD officers that afternoon at approximately 1:00 p.m. While under the care of Dr. Sarath and the treatment team, Defendant exhibited no signs of psychosis.

Turning to the events involving law enforcement, the Court finds that sometime prior to March 5, 2007, an unknown suspect threw several explosive devices, including pipe bombs and a

Molotov cocktail, into the SPD impound lot. Several of the explosive devices landed under and around Defendant's gold Dodge Dakota Truck, but also damaged at least one other nearby vehicle. On March 5, 2007, Agent Waggoner was asked to assist in the bombing investigation, as was Agent Foster. The agents, and other law enforcement officers, began investigating the matter that same day. By March 6, 2007, Agent Waggoner had at least three possible suspects, including Defendant.

During the evening of March 6, 2007, Agent Foster and an unidentified RCSD officer met Tim Jones near the Residence, and Tim Jones then led the officers to the Residence. Once at the Residence, Agent Foster advised Mrs. Jones that her husband was a person of interest, but also advised Mrs. Jones that he needed to search the Residence, outbuildings, and vehicles to determine whether there was a threat to Defendant's or Mrs. Jones' safety. Mrs. Jones consented to a search of the vehicles and outbuildings, and signed two consent forms to that effect [Exhibits 2,3], but did not, at that time, consent to a search of the Residence. Agent Jones conducted a search of the vehicles and outbuildings and was given permission to take a sample of some wire found in a shed near the Residence. At some point that evening, Agent Foster told either Mrs. Jones or Tim Jones that he would like to return the next day to search the Residence.

On the afternoon of March 7, 2007, Agent Foster, Agent Waggoner, and Detective Bice returned to the Residence and again spoke with Mrs. Jones. When Mrs. Jones opened the door, the officers observed firearms in plain view in the Residence. By this point in the investigation, the officers knew that Defendant was a previously convicted felon. Mrs. Jones came out to the porch of the Residence and spoke with the officers. The officers told Mrs. Jones that her husband was suspected of creating bombs and they asked if she would consent to a search of the Residence. The officers explained to Mrs. Jones that she did not have to consent to the search, that she could contact

an attorney, gave Mrs. Jones a consent form, and explained and read the consent form to her. At some point during this conversation, Ms. Clayton arrived at the Residence and joined the officers and Mrs. Jones on the porch. Mrs. Jones asked the officers what would happen if she did not consent to the search and was told that the officers would obtain a warrant if she did not consent.

At some point after Ms. Clayton's arrival, Mrs. Jones consented to the search, and both Mrs. Jones and Ms. Clayton signed the consent form [Exhibit 1], with Ms. Clayton signing as a witness. The three officers then conducted a quick security sweep of the Residence and were soon joined by a number of other law enforcement officers for a complete search of the Residence. During the search, the officers found what the officers believed to be pipe bombs and other bomb components in the basement, as well as a lathe with metal shavings nearby. The officers brought Mrs. Jones down to the basement to show her the suspected pipe bombs and then evacuated the Residence until the Chattanooga Bomb Squad could arrive to secure the suspected bombs.

At some point during the search, Defendant had been transported from Moccasin Bend to the Rhea County Jail. Defendant was being held for alleged outstanding state probation violations. Agent Waggoner knew Defendant was going to be released that day and made arrangements for Defendant to be taken to the Rhea County Jail, rather than to the county where his charges were pending.

While waiting for the bomb squad to arrive, Agent Waggoner decided to drive to the jail to interview Defendant. At the jail, Agent Waggoner was met by Detective Potter, who assisted the agent with the interview of Defendant. Agent Waggoner, Detective Potter, and Defendant met in an interview room at the RCSD. The officers told Defendant they wanted to speak to him about the bombing and Agent Waggoner described the results of his investigation so far. The officers asked

Defendant if he would agree to speak with them. Defendant agreed, so the officers read Defendant his rights. The officers also gave, and explained, a waiver form to Defendant, which he signed. [Exhibit 4]

After signing the waiver, Defendant spoke with the officers, but at first denied any knowledge of the bombing. Detective Potter than asked to speak to Defendant alone, so Agent Waggoner left the room and watched the interview through a two-way mirror in an adjoining office. Agent Waggoner could not hear what was said after he left the room, but Detective Potter asked Defendant if he would be more comfortable with a local person rather than a federal agent and Defendant agreed. Defendant and Detective Potter discussed the bombing, and Defendant confessed to the crimes. Detective Potter than left the room and told Agent Waggoner that Defendant had confessed.

The two officers then returned to the interview room and resumed the interview. The officers asked Defendant to make a written statement, which Defendant did. [Exhibit 4] Defendant told the officers that he had created pipe bombs at his Residence and had bombed the SPD impound lot because he was angry with the SPD for impounding his car. At some point near the end of the interview Agent Parris joined the officers and Defendant in the interview room. At no point during the interview did Defendant ask to speak to an attorney. At no point during the interview did the officers threaten Mrs. Jones, nor did the officers tell Defendant that Mrs. Jones had been taken into custody, was handcuffed, and was crying. The interview was not recorded.

After completing the interview, Agent Waggoner returned to the Residence. Upon returning, Agent Waggoner rejoined the search that was still in progress. By this point, Tim Jones had joined Mrs. Jones and Ms. Clayton at the Residence. After returning to the Residence, Agent Waggoner

63

found some prescription pills in a toolbox in the basement. The prescriptions were in the name of Ms. Clayton. The officers asked Mrs. Jones to sign a separate consent form to cover the medication, which she did. [Exhibit 6] At no point during the search of the Residence was Mrs. Jones taken into custody, nor was she placed in handcuffs. No threats or force were used on Mrs. Jones, Ms. Clayton, Tim Jones, or Defendant.

## IV. MOTION TO SUPPRESS STATEMENTS

Defendant first moves the Court to suppress all statements made by Defendant as to the events at issue in this case, including any statements made on March 7, 2007. As grounds, Defendant contends that any statements made by Defendant were not made voluntarily, knowingly, and intelligently. Defendant further argues that, at the time the statements were made, he had not yet recovered from his recent treatment at Moccasin Bend Mental Health Institute ("Moccasin Bend") and further argues that law enforcement agents threatened to charge Defendant's family if Defendant did not assist the police, thus forcing Defendant to make the statements at issue. The government opposes the motion, arguing that Defendant made a voluntary, knowing, and intelligent waiver of his rights, and thus the statement is valid and admissible.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436,478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

Additionally, even when the <u>Miranda</u> warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those <u>Miranda</u> rights before it may introduce an incriminating statement by a defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. <u>Id.</u> at 168. To determine whether a confession was voluntary, the court must examine the following factors in light of totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. <u>McCall v. Dutton</u>, 863 F.2d 454, 459 (6th Cir. 1988). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Id.</u> at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." <u>McCall</u>, 863 F.2d at 459 (citing <u>Connelly</u>, 479 U.S. at 163-64). "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." <u>United States v. Newman</u>, 889 F.2d 88, 94 (6th Cir. 1989); <u>see also</u> <u>United States v. Dunn</u>, 2008 WL 698940, at *4 (6th Cir. Mar. 17, 2008) (holding that defendant's assertion that he was under the influence of Vicodin and marijuana when he waived his rights did not render his statement involuntary in the absence of police coercion).

In the instant case, Defendant argues that during the March 7th interview with law

enforcement, he was still suffering from the effects of his drug overdose, was suffering from the effects of his mental illness, including severe depression and psychosis, as well as from the effects of the medication he had been placed on at Moccasin Bend. Defendant contends that the combined effect of these conditions effectively removed his ability to make a knowing, voluntary, and intelligent waiver. Defendant further argues that, in this weakened state, his will was overborne by the officers' threats against his wife.

Initially, the Court notes that it is faced with the unenviable task of weighing the conflicting testimony of two competing medical witnesses. The Court is by no means an expert in psychiatry, and the Court certainly appreciates both the services that Dr. Coyle and Dr. Sarath provide to the community, as well as their willingness to provide testimony in this case. However, in this instance, the Court finds the testimony of Dr. Sarath to be more reliable and credible. It was Dr. Sarath who treated Defendant during the period immediately prior to the events of March 7th, and it was Dr. Sarath who was involved in the decision to release Defendant on March 7, 2007. Dr. Sarath saw Defendant on March 7, 2007, and observed no signs of confusion, no signs that Defendant was groggy or otherwise affected by his medications or the drugs he had previously overdosed on, and no signs of psychosis. Certainly, Dr. Sarath did not diagnose Defendant to be in perfect mental health, but he did find that Defendant was fit to be released from Moccasin Bend.

In contrast, Dr. Coyle did not treat Defendant until January 10, 2008, approximately ten months after the events in question. In light of that timing, Dr. Coyle cannot, with any degree of certainty, testify as to what Defendant's mental condition was on March 7, 2008. Rather, as Dr. Coyle admitted during his testimony, he relies on what he was told by Defendant. Dr. Coyle freely admitted that if he was given incorrect information by Defendant, then that would have affected his

66

medical opinions. Thus, the weight to be afford Dr. Coyle's testimony hinges in large part on the credibility of the Defendant, and the Court finds the Defendant's credibility to be lacking. Dr. Coyle was also an expert retained to testify for Defendant in this case, whereas Dr. Sarath was Defendant's treating psychiatrist.

Defendant argues that he was suffering from severe mental impairments on March 7th, that he was actively hallucinating, and that he was still groggy from his medications. However, over a year later, at the suppression hearing, despite this supposedly debilitated state, he was allegedly able to describe the events of that day with great detail, which details conveniently add up to a story which would require the Court to find not only that the law enforcement officers all lied under oath at the hearing, but also that they displayed a complete and utter disregard of Defendant's constitutional rights, and would also require the Court to find that they then conspired to hide any evidence of their actions. While the Court recognizes, and in the past has found, that officers, like any other human being, can, and sometimes do, violate a defendant's constitutional rights, the Court finds no credible evidence of such action in this case. Given the Defendant's arguments as to his mental condition, the Court finds the level of detail in Defendant's testimony is both contradictory and impeaching. The Court finds that this, coupled with Dr. Sarath's testimony, indicates that Defendant's arguments as to his debilitated mental condition are exaggerated. The Court does not find the Defendant's testimony on this issue to be credible.

In addition, the Court notes that Defendant testified that he had received medication on the morning of March 7, 2007, while at Moccasin Bend. [Doc. 40 at p. 148] However, Dr. Sarath testified that Defendant received his anti-depression medication at night, because of its sedating effect and because the doctor also wanted to use the medicine to help with Defendant's difficulty

sleeping. [Doc. 55 at p. 20] Dr. Sarath also testified that he did not believe Defendant received any pain medication during his stay at Moccasin Bend. [Id. at p. 22] Thus, the testimony of Defendant's physician directly refutes Defendant's claim that he received medication on the morning of March 7, 2007.

Thus, after considering the evidence of record, and after weighing the testimony presented on each side, the Court finds that the Defendant's testimony is not credible. Based on that finding, the Court finds that, because of Dr. Coyle's admitted reliance on the Defendant's version of events, the weight to be afforded Dr. Coyle's testimony is further weakened,. At the same time, the Court finds the testimony of Dr. Sarath, Agent Waggoner, and Detective Potter to be credible and reliable.

In so ruling, the Court also recognizes that Ms. Clayton testified that she overheard Agent Waggoner tell the Rhea County Sheriff that the officers had obtained a confession from Defendant by threatening Defendant's wife. However, as the Court discusses in greater detail below, the Court does not find Ms. Clayton's testimony on this matter to be credible, but rather finds the testimony of Agent Waggoner, and his denials of threatening Defendant's family and of making the alleged statement to the Rhea County Sheriff, to be credible.

Thus, based upon the evidence of record, the Court finds that Defendant was read his rights prior to the confession; Defendant did not ask for an attorney; Defendant was not threatened with the prosecution or other mistreatment of his wife; Defendant was not told that he would receive his medications only if he assisted the police; and Defendant was not acting under a weakened mental condition sufficient to affect his knowledge and the voluntariness of his confession during the events of March 7, 2007. In light of these findings, the Court must find that the conduct of the officers was not coercive, but rather the police read Defendant his rights, which Defendant understood, asked

Defendant to waive those rights, which he did, and then asked Defendant to discuss the events in question with them, which Defendant did. In the absence of coercive police conduct, the Court finds that the actions of the officers in no way overbore Defendant's will. Thus, based on the totality of the circumstances, the Court finds by a preponderance of the evidence that the Defendant made a knowing, voluntary, and intelligent waiver of his rights. Accordingly, the Court respectfully recommends that Defendant's motion to suppress statements [Doc. 20] be denied.

## V.  MOTION TO SUPPRESS EVIDENCE OBTAINED FROM SEARCH OF RESIDENCE

Defendant also moves the Court to suppress all evidence obtained from the March 7, 2007, warrantless search of Defendant's residence.[7] As grounds, defendant contends that law enforcement did not obtain a warrant prior to searching the residence. Defendant further argues that any consent to such a search was invalidated by coercive tactics employed by law enforcement. Defendant contends that the officers relied on misrepresentation and trickery to obtain consent, thus invalidating the consent. The government opposes the motion, arguing that Mrs. Jones provided voluntary consent to search, that she was not coerced into providing that consent, and thus that the search was valid.

Fundamental to the Fourth Amendment's protection from unreasonable search and seizure is the principle that "[w]arrantless searches are presumptively unreasonable, though the [United States Supreme] Court has recognized a few limited exceptions to this general rule." Cal. v. Ciraolo, 476 U.S. 207, 225 (U.S. 1986). One such exception, and the only one relied upon by the

---

[7]The Court notes that in neither the Defendant's motion to suppress evidence [Doc. 21], nor in the argument of counsel, did Defendant address or seek to suppress the search performed by Agent Foster on March 6, 2007. As Defendant has not raised that issue, the Court does not address it, but instead focuses on the search of March 7, 2007.

government, is when the search is conducted pursuant to the consent of the subject of the search or the consent of "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). ""It is the government's burden, by a preponderance of the evidence, to show through clear and positive testimony that . . . valid and voluntary consent to the search was obtained." United States v. Worley, 193 F.3d 380, 385 (6th Cir. 1999). The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion . . . is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). To determine if consent was voluntary, a district court must look at the totality of the circumstances and examine the following factors: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999). The Sixth Circuit has also held that "[i]t is well-settled that [an] agent's statements to the effect that he would obtain a warrant if [an individual] did not consent to the search does not taint [the individual's] consent to a search." United States v. Salvo, 133 F.3d 943, 954 (6th Cir. 1998).

As an initial matter, the Court finds that law enforcement were entitled to come to the Residence and speak with Mrs. Jones. As the Sixth Circuit held in the case of United States v. Grayer, 232 Fed. App'x 446, 451 (6th Cir. 2007):

> no level of suspicion was required before the officers approached the residence and questioned [the defendant], or whomever happened to answer the door. Accordingly, the knock on the door and subsequent discussion was a purely consensual encounter, which officers may initiate without any objective level of suspicion. See Bennett v. City of Eastpointe, 410 F.3d 810, 821 (6th Cir. 2005) ("A purely

70

> consensual encounter between a police officer and a citizen does not
> implicate the Fourth Amendment."). We have expressly approved of
> these so called "knock and talk" consensual encounters as a
> legitimate investigative procedure so long as the encounter does not
> evolve into a constructive entry. See United States v. Thomas, 430
> F.3d 274, 277 (6th Cir. 2005) ("Consensual encounters do not lose
> their propriety, moreover, merely because they take place at the
> entrance of a citizen's home.").

Grayer, 232 Fed. App'x at 451. Thus, the Court need not determine whether the officers had

reasonable suspicion or probable cause to approach the Residence, as such a basis is not needed to

initiate a consensual encounter.

The Court finds that Mrs. Jones freely admitted that she was given a consent form, that she

consented to the search of the Residence, and that she signed the consent form and was advised that

she did not have to provide consent. Thus, there is no question of whether consent was provided,

but only whether the consent was freely given. The Court also finds that there is no argument, and

indeed none has been made, that Mrs. Jones was not entitled to consent to the search of the

Residence, thus the Court need not address the issue of Mrs. Jones' legal capacity to consent to a

search of the Residence.

The Court turns next to the issue of the use of deceit or trickery in relation to consent to

search. The Sixth Circuit has held that consent can be obviated by duress, coercion, or trickery.

United States v. Buchanan, 904 F.2d 349, 355 (6th Cir. 1990). The Sixth Circuit addressed the issue

in more detail in the case of United States v. Hardin, 539 F.3d 404 (6th Cir. 2008). In that case, the

Sixth Circuit held that:

> As a general proposition, although a ruse or officers' undercover
> activity does not usually violate individuals' rights, n11 we have
> noted that "[w]here, for example, the effect of the ruse is to convince
> the resident that he or she has no choice but to invite the undercover
> officer in, the ruse may not pass constitutional muster." United

71

States v. Copeland, No. 95-5596, 1996 U.S. App. LEXIS 17177, 1996 WL 306556, at * 3 n.3 (6th Cir. June 6, 1996) (citing People v. Jefferson, 43 A.D.2d 112 (N.Y. App. Div. 1973), as holding that consent was "not voluntary and search violat[ed the] Fourth Amendment where officers obtained entry by saying that they were investigating [a] gas leak"); see also 2 Wayne R. LaFave et al., CRIM. PROC. § 3.10(c) (3d ed.) (2007) ("[W]hen the police misrepresentation of purpose is so extreme that it deprives the individual of the ability to make a fair assessment of the need to surrender his privacy . . . the consent should not be considered valid."). Likewise, in United States v. Carter, 378 F.3d 584, 588 (6th Cir. 2004) (en banc), we recognized that "[a] number of cases . . . have held that the confrontation between police and suspect was impermissibly tainted by 'duress, coercion [or] trickery.'" (quoting United States v. Jones, 641 F.2d 425, 429 (6th Cir. 1981)); see also Hoffa v. United States, 385 U.S. 293, 301 (1966) ("The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area.").

Hardin, 539 F.3d at 424-25. The Hardin court provided the following additional citations in support

of its holding that the use of trickery could vitiate the voluntary nature of a consent to search:

we here include a few additional cases to illustrate the decidedly non-novel proposition that officers may invalidate an individual's consent through the use of certain ruses or trickery. See, e.g., United States v. Watzman, 486 F.3d 1004, 1006-07 (7th Cir. 2007) (observing that the government did not challenge the district court's conclusion that a particular search was invalid when officers conducted a""phony 'burglary follow-up'" in which the officers visited the defendant's apartment and "told him they were following up on a burglary he had reported two years earlier" when the officers in fact were targeting the defendant in an investigation into child pornography); Krause v. Commonwealth, 206 S.W.3d 922, 924-28 (Ky. 2006) (stating that, in a case involving an officer who intended to search for drugs but invented a story that "a young girl had just reported being raped by [defendant's roommate] in the residence" and "asked if he could look around in order to determine whether her description of the residence and its furnishings was accurate," "[t]he use of this particular ruse simply crossed the line of civilized notions of justice"); Butler v. Compton, 158 F. App'x 108, 109, 111 (10th Cir. 2005) (holding that the plaintiff "has set forth a cognizable claim that [the officer] violated his Fourth Amendment right" when the officer knocked on the plaintiff's motel door and "replied that he was

72

'maintenance' and that he was there to fix the sink"); United States v. Soto, 124 F. App'x 956, 961 (6th Cir. 2005) ("The government has the burden of proving that a valid consent was obtained and "that the consent was uncontaminated by duress, coercion, or trickery'") (quoting Jones, 641 F.2d at 429). . . .

We do emphasize that, in many circumstances (such as undercover activity designed to uncover illegal conspiracies and acts), ruses and deception may be a perfectly valid tactic for law enforcement. See, e.g., Lewis, 385 U.S. at 210 (stating that a per se bar on deception would "severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings," such as "narcotics traffic"). Likewise, several courts have approved the use of deception in the execution of an arrest warrant so as to avoid the potential for violence. See, e.g., United States v. Michaud, 268 F.3d 728, 731, 733 (9th Cir. 2001) (stating that, in case involving officer who "knocked on [the defendant's] door, claimed to be the assistant manager of the hotel and told her that her boyfriend was sick and needed her assistance," the defendant's "objection to the use of trickery to encourage her to open her hotel room door is unavailing, given the existence of a valid [arrest] warrant"); Iowa v. Ahart, 324 N.W.2d 317, 319 (Iowa 1982) (stating that "[p]olice may use deceptive ploys to secure entry to execute a valid search or arrest warrant"). The problem here is that the deception was carried out by the apartment manager, who was certainly not executing the arrest warrant; rather, the apartment manager's ruse was used to ascertain whether the officers could execute an arrest warrant in compliance with Payton. The use of a ruse when officers already have probable cause or reason to believe that a person named in an arrest warrant is inside a residence involves an entirely different factual circumstance than that presented in this case.

Hardin, 539 F.3d at 425 n. 12. The Hardin court then held that an apartment manager acted as an agent of the government when he entered the defendant's apartment, and that the apartment manager's use of a

ruse regarding [a] water leak presented a situation in which an individual would feel 'no choice but to invite the undercover officer in' and any consent was invalid. Copeland, 1996 U.S. App. LEXIS 17177, 1996 WL 306556, at *3 n.3; see also United States v. Giraldo, 743 F. Supp. 152, 153-55 (E.D.N.Y. 1990) (granting defendant's

73

motion to suppress evidence when officer "pretended to be a gas
company worker and told defendant she was checking for a gas leak"
because "'[c]onsent' was obtained by falsely inducing fear of an
imminent life-threatening danger").

Hardin, 539 F.3d at 425.

With all of this jurisprudence in mind, the Court turns to the instance case. Based upon the

evidence before the Court, the Court finds that there is credible testimony that the officers did advise

Mrs. Jones that her husband was a suspect and that was the basis of their request to search. The

Court finds as credible Agent Waggoner's testimony that on March 7, 2007, prior to her consent,

Mrs. Jones was told that the officers were investigating pipe bombs found at the SPD impound lot

and that her husband was a suspect. The Court also finds as credible Agent Foster's testimony that

Agent Waggoner told Mrs. Jones that her husband was person in interest in the case, that there could

be bomb components in the residence, and that the officers needed to look for those to determine

if the residence was safe.[8] Similarly, Detective Bice testified that Mrs. Jones was informed, prior

to her consent, that her husband was a suspect.

The Court further finds as credible Agent Waggoner's testimony that Mrs. Jones was given

the consent to search forms, that the officers explained and read the forms to her, that she was

advised she did not have to consent to the search, but rather that it was a voluntary consent form,

and that she could speak with an attorney if she so desired. The Court further notes that Exhibit 1,

---

[8]Given that Agent Waggoner's testimony was essentially that he told Mrs. Jones that he
wanted to search the Residence because he believed that her husband might be making pipe
bombs in the Residence, and Agent Foster's testimony that Mrs. Jones was told that the officers
needed to search the Residence for bomb components, the Court does find that the search may,
in part, have been predicated on a concern for her safety because of the possible presence of pipe
bombs or other explosive devices or materials in the Residence. The Court does not find that on
March 7, 2007, the officers relied on, nor conveyed the existence of, a threat to Defendant or
Mrs. Jones from a third party as a basis for the search.

the consent to search form, indicates that the search would include fire arms, ammunitions, and "components to make devices," and that the form authorizes the seizure of any items "which are evidence of a crime." [Exhibit 1]

The Court notes that Agent Foster initially testified that, on March 7th, the officers also told Mrs. Jones that the officers were concerned about a possible threat from a third party, but later testified that he had confused the events of March 6th and March 7th, and that on the 7th the officers did not rely on a threat by a third party as a basis for the search. Based on the Court's observation of the demeanor of all of the witnesses during their testimony, the Court does not find Agent Foster's change in testimony incredible, not in light of the other testimony of witnesses and the approximately nine month period between the events in question and the time of his testimony. However, based on the evidence before the Court, even to the extent that Mrs. Jones was told on March 7th that among the reasons the officers wished to search the Residence was the reason that they thought that there might be a danger or she might be in danger, the Court would not find that such a statement was untrue or made in an effort to trick Mrs. Jones into providing consent. Based on the evidence before the Court, before obtaining consent on March 7th, the officers did suspect that Defendant was making bombs in or around the Residence, and thus it was reasonable to suspect that there might be additional bombs, or other dangerous materials, in the Residence, and such materials could pose a threat to the safety of Mrs. Jones and others.

The fact that the officers did not evacuate Mrs. Jones on March 6th, or seek to search the Residence on the night of March 6th, does not alter the Court's finding that the officers had a reasonable belief that Mrs. Jones might be in danger. Rather, the Court finds that, as of March 6th, Agent Foster was not yet convinced that Defendant was the suspect, but, as he testified at the

75

hearing, "by the 7th, I knew that we knew more positively that [Defendant] was our person of interest, our suspect." [Doc. 40 at p. 67] Thus, while the Court finds that the officers did tell Mrs. Jones that the reason for their search was that her husband was a suspect, the fact that the officers were still concerned with her safety, would not constitute a statement of impermissible fraud or trickery, but rather an accurate statement of the officers' reasonable concern. For the Court to invalidate a search merely because the officers stated a reasonable, and truthful, belief that an individual might be in danger would fly in the face of reason and would too greatly hinder the investigations of law enforcement and the safety of citizens, and the Court would not invalidate the search on that basis. The Court further finds that the legitimacy and reasonableness of this concern is born out by the fact that after the items referred to as pipe bombs and pipe bomb components were found in the Residence, the Residence was then evacuated until the Chattanooga Bomb Squad could arrive to secure the suspected pipe bombs. [Doc. 40 at p. 162]

In ruling that the officers provided credible testimony that they told Mrs. Jones that her husband was a suspect, the Court necessarily finds as incredible Mrs. Jones' and Ms. Clayton's testimony to the contrary. The Court notes that on direct examination Mrs. Jones testified that she "was never told that [Defendant] was a suspect in anything, they just wanted to check our home to make sure everything was safe." [Doc. 40 at p. 155] However, Ms. Clayton testified that after Mrs. Jones signed the consent form, the officers told Ms. Clayton and Mrs. Jones that they suspected that Defendant made a bomb. [Id. at p. 175] Thus, Ms. Clayton's testimony confirms the officers did tell her and Mrs. Jones that Defendant was a suspect (only disagreeing as to time), which directly contradicts Mrs. Jones testimony, and confirms the officers' testimony on this issue. As to the timing issue, the Court finds that because Ms. Clayton was not present when the officers and Mrs.

Jones first conversed, but arrived later [Id. at pp. 155, 174-75], it is likely, and consistent with the officers' testimony, that Ms. Clayton did not hear the officers' earlier statements about Defendant being a suspect, but did hear a subsequent similar statement. Further, although Mrs. Jones at times said that she was not told that Defendant was a suspect, she also testified at one point that she did not recall that the officers said Defendant was a suspect [Id. at p. 160], but only recalled the officers saying that they could obtain a search warrant if she did not consent to the search. The Court notes that Mrs. Jones recall was thus suspect and questionable, including the fact that she could not recall the she even signed the consent forms the night before. After observing all of the witnesses in this matter, and after weighing the testimony in question, the Court finds that the contradictory testimony of the defense witnesses on this issue is incredible and does not impeach the testimony of the officers.

Having found that the officers did not use deceit or trickery in obtaining consent, the Court turns next to the remaining factors set forth above: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999). The Court finds that the age, intelligence, and education of Mrs. Jones all weigh in favor of a finding of voluntary consent. From observing Mrs. Jones, the Court finds that she was intelligent, was a mature, educated adult and of an age to understand the consequences of providing consent, and that there was no evidence to the contrary. Mrs. Jones herself testified that she was advised that she had the right to refuse and did not have to sign the consent form. [Doc. 40 at p. 157]

Turning to the next factor, that of whether the Mrs. Jones understood her constitutional

rights, the Court finds that she did. The officers testified that they read the waiver form to Mrs. Jones. The Court finds Mrs. Jones' abbreviated testimony [Doc. 40 at p. 156] indicative of an affirmative answer, and Ms. Clayton's testimony, arguably to the contrary, that she did not remember the officers reading the consent form to them, but instead that the officers just told them what it was [Doc. 40 at p. 177], does not indicate that Mrs. Jones did not understand her rights. Additionally, there is evidence of record that Mrs. Jones can read, that she signed the rights waiver, that Ms. Clayton signed the waiver as a witness, and that Mrs. Jones was told that she did not have to consent to the search. There is no testimony whatsoever that she did not understand what she was signing. Given the record before the Court, there is no basis for the Court to find that Mrs. Jones did not understand her rights, and in light of all the testimony, the Court finds that she did understand her rights.

As to the final two factors, the length and nature of detention and the use of coercive or punishing conduct by the police, the Court finds that Mrs. Jones was not detained at the time of consent, or at any time afterwards. As such, the Court finds that there was no evidence that the officers resorted to coercive conduct, nor evidence of punishing conduct. The Court finds that the atmosphere was not objectively coercive at all, as Mrs. Jones had her mother-in-law present with her. There is no evidence that any threats were made, nor any intimidation tactics used, nor was anyone detained.

Accordingly, after weighing all of the requisite factors, the Court finds, by a preponderance of the evidence and based on the totality of the circumstances, the government has established by clear and positive testimony that Mrs. Jones did provide voluntary consent to the officers. The Court further finds, by the same standards, that the officers did not resort to impermissible tactics to obtain

that consent. The Court specifically notes that the testimony of various witnesses, while at times different and/or contradictory to the testimony found as credible herin, was neither sufficiently credible nor legally sufficient to overcome the clear and positive testimony of the government witnesses, nor was it sufficient to establish by a preponderance of the evidence that the consent to search was not voluntary. Thus, in light of Mrs. Jones' voluntary consent, the search of March 7, 2007, was constitutionally permissible. Accordingly, there is no basis to suppress the results of that search, and the Court respectfully recommends that the defendant's motion [Doc. 21] be denied.

## VI. CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Jeffrey Dean Jones' Motion to Suppress Statements [Doc. 20] and Motion to Suppress Evidence Obtained From Search of Residence [Doc. 21] should be **DENIED**.[9]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[9] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).